**CAPITAL FINANCE & COMMERCE AG, Appellant,**

v.

**SINOPEC OVERSEAS OIL & GAS, LTD. and FIOC Holder Representative, L.L.C., Appellees.**

No. 01–06–00822–CV.

Court of Appeals of Texas, Houston (1st Dist.).

May 22, 2008.

John E. O'Neill, Reagan D. Pratt, Howrey LLP, Houston, TX, for Appellant.

George T. Shipley, Joel Z. Montgomery, Shipley Snell Montgomery LLP, Kendall M. Gray, Joe C. Holzer, Sylvia A. Matthews, Rosemarie Donnelly, Andrews & Kurth, L.L.P., Rebeca Aizpuru Huddle, Maria Wyckoff Boyce, Baker & Botts, L.L.P., Houston, TX, for Appellees.

Panel consists of Chief Justice RADACK and Justices HANKS and HIGLEY.

## OPINION

SHERRY RADACK, Chief Justice.

This is an accelerated, interlocutory appeal from an order sustaining a special appearance.[1] *See* TEX. CIV. PRAC. & REM.

---

1. The record on appeal has been partially sealed by order of the trial court. *See* TEX.R.

CODE ANN. § 51.014(a)(7) (Vernon Supp. 2007); TEX.R. CIV. P. 120a. Capital Finance & Commerce AG (Capital Finance) challenges the special appearances rendered in favor of appellees, Sinopec Overseas Oil & Gas, Ltd. (Sinopec Overseas) and FIOC Holder Representative, L.L.C. (Holder Representative). In four issues, Capital Finance contends that Texas may properly assert personal jurisdiction, both specific and general, over Capital Finance's claims that Sinopec Overseas and Holder Representative, in conspiracy with others, fraudulently diverted funds deriving from a merger transaction in order to prevent payment of a contingent commission, or finder's fee, to Capital Finance. We affirm.

### Facts and Procedural Background

### A. Overview of Pertinent Entities

Capital Finance is a brokerage company located in Zug, Switzerland. The commission that Capital Finance seeks derives from its agreement with former First International Oil Corporation (former FIOC) and was contingent upon Capital Finance's obtaining a purchaser of former FIOC's stock. Former FIOC ultimately merged with Sinopec International Petroleum Exploration and Projection Corporation (SIPC) in a transaction that closed in August 2004 and resulted in several new entities. Capital Finance's agreement with former FIOC predates that merger by two years. SIPC is part of a larger oil company owned by the government of The People's Republic of China (China).

Capital Finance's named defendants include First International Oil Co., Ltd. (new FIOC), which has not contested jurisdiction.[2] In addition to Sinopec Overseas and Holder Representative, Capital Finance also sued three individuals who were officers of former FIOC, none of whom have contested jurisdiction. New FIOC is a Bermuda limited-liability corporation, with principal headquarters in Kazakhstan.

Holder Representative, Sinopec Overseas, and new FIOC were all formed incident to the merger of SIPC and former FIOC. Holder Representative, formed shortly after the merger, is a Delaware limited-liability corporation with headquarters in New York City. Sinopec Overseas is a Cayman–Islands limited-liability corporation with principal headquarters in Beijing; it was formed by Cayman–Islands counsel approximately three months before the actual merger. Sinopec Overseas has many subsidiaries, which operate in many different countries and were organized under the laws of several different countries. New FIOC is one of Sinopec Overseas' subsidiaries.

### B. Preliminaries to the Merger of Former FIOC and SIPC

Former FIOC was a Delaware corporation with headquarters, but only minimal assets, in Houston. Through subsidiaries, former FIOC owned licenses to explore oil and gas properties, almost all of which were located in the Republic of Kazakhstan. Hassan M. Yousefzai is the managing director of Capital Finance. He is one of several individuals and entities from whom former FIOC solicited assistance to locate companies with sufficient capital to

CIV. P. 76a.

**2.** Capital Finance's briefing often does not distinguish between former FIOC and new FIOC, referring to both as "FIOC." Capital Finance's claims against new FIOC include a successor-liability claim for the finder's fee that Capital Finance seeks in this lawsuit. Capital Finance has not sued either SIPC or Nahid DeCamillis, to whom a finder's-fee commission was ultimately paid, in the underlying lawsuit.

purchase the stock of former FIOC. Former FIOC was introduced to SIPC in Beijing in spring 2002.

## C. Letter Agreement between Capital Finance and Former FIOC

On June 2, 2002, Yousefzai and the chairman of former FIOC executed a letter agreement to "formalize" and "define" their relationship.[3] Under the terms of this letter agreement, former FIOC agreed to pay Capital Finance a finder's-fee commission equal to five percent of the purchase price. The agreement was contingent upon "direct efforts" by Capital Finance that resulted in the sale of the outstanding shares of former FIOC. The letter agreement recites that the five percent commission was an increase over a two and one-half percent commission that the parties had previously discussed and advised Yousefzai that the "commission payable will be shared with your associates," including "Mrs. N. DeCamillis (with whom you have a formal arrangement)."

## D. Memorandum of Understanding between SIPC and Former FIOC; Formation of Sinopec Overseas

On January 19, 2004, former FIOC and SIPC entered into a memorandum of understanding (MOU),[4] by which SIPC proposed to acquire "all of the outstanding capital stock and other equity interests of former FIOC." The MOU identifies the buyer as either "SIPC or a direct or indirect subsidiary or affiliated company of SIPC" and the "Merger Sub" as a "direct,

wholly owned subsidiary of Buyer." Three days later, on January 21, 2004, SIPC formed Sinopec Overseas, a Cayman-Islands, limited-liability corporation with headquarters in Beijing, as "buyer," in accordance with the MOU. The payment-calculation provisions of the MOU stated an aggregate consideration to be paid by the buyer (by definition, by SIPC or a direct or indirect subsidiary or affiliated company of SIPC) "to all of the holders of [former] FIOC common stock and Options." The MOU specified that a portion of the total consideration would be placed in an escrow account to protect the buyer (again, by definition, SIPC or a direct or indirect subsidiary or affiliated company of SIPC) from any breaches of merger-related warranties by former FIOC. The MOU also envisioned an escrow account to protect payments to former FIOC shareholders.[5]

In addition to many other items that affected calculation of the total aggregate consideration, the calculations specified that transaction costs of former FIOC would "include finder's fees," which would be deducted from the aggregate consideration, and thus remain the responsibility of former FIOC.

## E. March 16, 2004 Merger Agreement; Formation of Holder Representative

On March 16, 2004, former FIOC entered into a merger agreement with SIPC and Sinopec Overseas whereby Sinopec Overseas would acquire former FIOC, which would then be merged "with and

3. Yousefzai signed the agreement as managing director of Capital Finance. The chairman of former FIOC, who signed the agreement on its behalf, is a named defendant in the underlying lawsuit.

4. The president of former FIOC signed the MOU; he is a named defendant in the underlying lawsuit.

5. Among other provisions, the MOU contemplated further due diligence by SIPC to confirm valuations and recognized the possibility of adjustments in the per share price.

into" a "Merger Sub." The merger agreement did not identify the merger sub by name, but specified that it would be structured as a Delaware corporation and that former FIOC would cease to exist as a Delaware corporation once the merger became effective. The transaction was both a merger and an acquisition of former FIOC by Sinopec Overseas; once the transaction closed, the shares of former FIOC terminated, and the holders of the shares, or equity owners, were entitled to cash payment.

On April 21, 2004, after the merger agreement was signed, a "special committee" of former FIOC's board of directors formed Holder Representative as the "merger sub" and Delaware company contemplated by the merger agreement. Holder Representative was created solely to represent the interests of former FIOC stockholders, option holders, and warrant holders in funds to be held in the escrow account contemplated by the MOU. Holder Representative conducted no other business or activity.[6]

As part of the merger agreement, Sinopec Overseas also created FIOC Limited, which we have referred to in this opinion as "new FIOC,"[7] as "a new, wholly owned

Bermuda limited company" of Sinopec Overseas to serve as "Merger Sub pursuant to this merger agreement."[8] New FIOC was the "acquisition vehicle" for the shares of former FIOC shareholders.

Pertinent to this litigation, the merger agreement specified that (1) a finder's fee commission would be paid on closing; (2) the purchaser, Sinopec Overseas, would owe no finder's fee commission; (3) the finder's fee commission would be paid to Mrs. Nahid DeCamillis and Moyes & Co; (4) former FIOC had provided the Buyer (Sinopec Overseas) with copies of all agreements with Moyes & Co., Inc., and Mrs. Nahid DeCamillis. In addition, this section of the merger agreement disclaims any other "brokerage, finder's or other fee or commission" in connection with the transactions contemplated by the merger agreement.[9]

The merger agreement identified Citibank as escrow agent and required that Sinopec Overseas provide a portion of the purchase consideration by immediate wire transfer of funds then available to Citibank, in accordance with the escrow agreement. In accordance with the merger agreement and a separate escrow agreement, an escrow fund was established at

---

**6.** Holder Representative's board of directors comprised three former stockholders, Victory Ventures LLC, Endeavor Capital Corporation, and Daniel Izdal who then chose a board of managers comprised of William Bonadies, Carl Kolbet, and Daniel Izdal. Izdal is a Texas resident.

**7.** The parties generally refer to new FIOC as FIOC Limited, but also refer to this company as FIOC Bermuda. The merger agreement sometimes refers to new FIOC as the "Amalgamated Company."

**8.** Former FIOC ceased to exist once the merger became effective. Capital Finance's pleadings nonetheless treat former FIOC and new FIOC as a single party and refer to both as FIOC.

**9.** More generally, the merger agreement specified that, when the merger became effective, "all the property, rights, privileges, powers, and franchises of the Company" (identified in the merger agreement as former FIOC) "shall vest and continue in the Amalgamated Company" (new FIOC; identified generally as the new Bermuda merger sub in the merger agreement). As Capital Finance acknowledges, "all debts, liabilities, obligations and duties" of former FIOC and Holder Representative "would continue and become the debts, liabilities, obligations and duties of the Amalgamated Company," again, new FIOC, under the merger agreement.

Citibank's offices in New York City. As required by the merger agreement, Holder Representative endorsed the escrow agreement, and the parties to the merger agreement and Citibank endorsed the escrow agreement. The rights of Sinopec Overseas to the escrow funds are limited to breaches of warranties and representations of the merger agreement; the shareholders of former FIOC also have rights to the escrow funds, in that they represented a right to payment for each share of former FIOC stock held.[10]

### F. August 6, 2004 Closing

The closing memorandum of August 6, 2004 recites a purchase price of approximately $165,000,000. A preliminary closing of the transaction between Sinopec Overseas and former FIOC took place in the offices of a Houston law firm on July 28 and 29, 2004,[11] followed by a ceremonial closing in London on July 29, 2004, and another closing in Houston on August 2, 2004. At this final closing, Sinopec Overseas wired funds from Beijing to the New York office of Citibank, and the contemplated escrow funds were deposited into the Citibank escrow account.

### G. This Lawsuit

Capital Finance filed this action after the merger, claiming an unpaid debt for the five percent finder's fee commission stated in Capital Finance's letter agreement with former FIOC. It is undisputed that an $8 million dollar finder's fee commission was paid to Nahid DeCamillis.[12]

### 1. Pleadings

Capital Finance alleges that both Holder Representative and Sinopec Overseas conspired to assist the former equity holders in their attempts to fraudulently transfer, convert, and remove assets remaining from the merger of former FIOC and SIPC from the jurisdiction of the trial court in order to hinder, delay, defraud, and generally prevent access to those proceeds. Capital Finance contends that both Holder Representative and Sinopec Overseas "have the power," under the escrow agreement that was made part of the merger agreement, to make distributions, not only to former FIOC's equity holders, but also "to satisfy" former FIOC's "undisclosed liability" to Capital Finance.

In addition to claiming that Sinopec Overseas participated in payment of "unlawful benefits" to Mrs. DeCamillis and a conspiracy not to pay Capital Finance, Capital Finance claimed that Sinopec Overseas was the alter ego of or single business enterprise with new FIOC, or both, and was created "as a sham to perpetrate a fraud" to prejudice former FIOC's creditors.

Capital Finance's allegations against Holder Representative and Sinopec Overseas sound exclusively in tort.[13] They in-

---

**10.** The escrow agreement is governed by New York law and requires arbitration in London. The record reflects that the New York offices of Citibank were chosen because Citibank does not have a branch in Houston.

**11.** The law firm has an office in Beijing, and much of the closing took place by telecopier transmission between the Houston and Beijing offices.

**12.** Capital Finance's live pleadings include claims that DeCamillis breached fiduciary

duties owed to Capital Finance, but DeCamillis is not named as a defendant.

**13.** Capital Finance also seeks damages from new FIOC for breach of contract and attorney's fees, in addition to alternative recovery in quantum meruit. In addition, Capital Finance asserts a successor-liability claim against new FIOC, based on the merger agreement's assignment to new FIOC of all of former FIOC's debts, liabilities, obligations, and duties.

clude (1) conspiracy to deprive Capital Finance of its finder's fee commission, by assisting to remove proceeds of the merger and by participating in the payment of "unlawful benefits" to Mrs. DeCamillis, (2) fraudulent transfer of assets by Holder Representative, which actively participated in its creation as an agent for former FIOC's equity holders, with the express, additional purpose of assisting to remove otherwise recoverable assets beyond the reach of Capital Finance, (3) fraudulent transfer by Sinopec Overseas, by acting either as the alter ego of or single enterprise with, or both, new FIOC, also with the express purpose of assisting to remove otherwise recoverable assets beyond the reach of Capital Finance, and also, with awareness of the debt to Capital Finance, knowingly causing former FIOC not to pay that debt and to pay finder's-fee benefits wrongfully to Mrs. DeCamillis.[14]

### 2. *Rule 120a Hearing and Ruling*

Sinopec Overseas and Holder Representative filed special appearances to challenge personal jurisdiction.[15] After permitting extensive discovery, including depositions, and conducting an evidentiary hearing,[16] the trial court sustained the special appearances and dismissed all of Capital Finance's claims against Sinopec Overseas and Holder Representative. The trial court did not issue findings of fact or conclusions of law.

### Special Appearance—Principles Pertinent to this Case

### A. Personal Jurisdiction over Nonresident Defendant

■ A Texas court may assert personal jurisdiction over a nonresident defendant only if the requirements of both the due process clause of the Fourteenth Amendment to the United States Constitution and the Texas long-arm statute are satisfied. *See* U.S. CONST. amend. XIV, § 1; TEX. CIV. PRAC. & REM.CODE ANN. § 17.041–.045 (Vernon 1997 & Supp.2007); *CSR Ltd. v. Link,* 925 S.W.2d 591, 594 (Tex.1996) (orig.proceeding). A court's exercise of personal jurisdiction over a party concerns the court's power to bind that party. *CSR Ltd.,* 925 S.W.2d at 594. The Texas long-arm statute allows a court to exercise personal jurisdiction over a nonresident defendant who "does business" in Texas, TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997),[17] and, among other acts, either contracts with a Texas resident or commits a tort in Texas. *Id.* § 17.042(1)-(2); *see PHC–Minden, L.P. v. Kimberly–Clark Corp.,* 235 S.W.3d 163, 166 (Tex.2007) (stating that examples of "doing business" listed in statute are not exclusive). Under the broad, "doing business" language of section 17.042, the supreme court has ruled that the statute reaches "as far as the federal constitutional requirements of due process will permit." *PHC–Minden,* 235 S.W.3d at 166. Due process criteria compel that (1) the

---

14. Capital Finance asked the trial court to declare a "constructive trust" over escrowed funds for Capital Finance's benefit, "to the extent necessary to satisfy the Defendants' liabilities to [Capital Finance]," and also sought an injunction to prevent further disbursements to anyone but Capital Finance until its claims were paid.

15. The case was initially removed to federal court, but was remanded.

16. *See* TEX.R. CIV. P. 120a(1), (3).

17. The statute lists three activities that constitute "doing business," as follows: (1) contracting with a Texas resident when either party is to perform the contract in whole or in part in Texas; (2) committing a tort in whole or in part in Texas; and (3) recruiting Texas residents for employment inside or outside Texas. TEX. CIV. PRAC. & REM.CODE ANN. § 17.042.

defendant must have established minimum contacts with Texas, and (2) the assertion of jurisdiction comports with "traditional notions of fair play and substantial justice." *Id.* at 166.

### 1. Minimum Contacts Must Derive from Purposeful Availment

■ Texas may properly assert personal jurisdiction over a nonresident, consistent with the due process safeguards of the United States Constitution, when the defendant's minimum contacts with Texas are purposeful. *Xenos Yuen v. Fisher,* 227 S.W.3d 193, 200 (Tex.App.-Houston [1st Dist.] 2007, no pet.). An act or acts "by which the *defendant purposely avails* itself of the privilege of conducting activities" in Texas and "thus invok[es] the benefits and protection" of Texas law, constitutes sufficient contact with Texas to confer personal jurisdiction. *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex.2005) (emphasis in original) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958)).

■ The requirement of "purposeful availment" is the "touchstone of jurisdictional due process." *Id.; see IRA Resources, Inc. v. Griego,* 221 S.W.3d 592, 596–97 (Tex.2007) (holding that defendant's contacts with Texas were not "purposeful," but, rather, "random, isolated, or fortuitous"). Purposeful availment analysis incorporates at least three important inquiries. *IRA Resources, Inc.,* 221 S.W.3d at 596 (citing *Michiana Easy Livin' Country,* 168 S.W.3d at 785, and applying analysis). First, the only contacts that are material are those of the targeted defendant, and no one else's, *id.,* which ensures that no defendant is brought into Texas based solely on the unilateral activities of a third party. *Michiana Easy Livin' Country,* 168 S.W.3d at 785. Second, the acts of the defendant on which the plaintiff relies to assert jurisdiction must be purposeful, which ensures that jurisdiction is not based solely on contacts that are "random, isolated, or fortuitous." *Id.; see IRA Resources, Inc.,* 221 S.W.3d at 596. Third, a defendant "must seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction and, thus, impliedly consent[ing] to its laws." *IRA Resources, Inc.,* 221 S.W.3d at 596; *see Michiana Easy Livin' Country,* 168 S.W.3d at 785.

■ Foreseeability of an injury in Texas is not solely determinative, *Michiana Easy Livin' Country,* 168 S.W.3d at 789, but foreseeability of causing injury is "an important consideration" in deciding whether a nonresident defendant has purposefully established minimum contacts. *BMC Software, Belg., N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002).

### 2. Contacts Imputed through Texas Domiciliary

■ In this case, Capital Finance claims that Sinopec Overseas and Holder Representative are guilty of both fraud and conspiracy, having engineered the merger transaction in order to conceal or divert funds from creditors of former FIOC. But bare assertions of fraud and conspiracy, without more, are neither material nor relevant in assessing contacts to determine personal jurisdiction over a nonresident defendant. *See PHC–Minden,* 235 S.W.3d at 174–75 (stating that fraud, though "vital" to underlying attempt to pierce corporate veil, "has no place in assessing contacts to determine jurisdiction") (citing *Michiana Easy Livin' Country,* 168 S.W.3d at 790–91, as rejecting principle that defendant's directing a tort in Texas is relevant inquiry for specific jurisdiction because theory improperly "equat[ed] the jurisdictional inquiry with the underlying merits") and *Nat'l Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769, 773 (Tex.1995)

(declining to recognize personal jurisdiction based solely on allegations of conspiracy)). By alleging merely fraud and conspiracy, therefore, Capital Finance did not state sufficient grounds to warrant exercise of personal jurisdiction over Sinopec Overseas and Holder Representative.

As its only possible recourse, therefore, for purposes of exercise of personal jurisdiction over Sinopec Overseas and Holder Representative, Capital Finance had to rely on its allegations that these entities committed fraud and conspiracy through other entities, specifically, former FIOC's equity holders and new FIOC.

■ Texas may properly exercise personal jurisdiction over a nonresident defendant company if its relationship with a Texas-domiciled company establishes that they are one and the same, such that the Texas-domiciled company's "doing business" may be attributed to the nonresident company. *See PHC–Minden*, 235 S.W.3d at 172–76 (addressing "jurisdictional veil-piercing" as basis for assertion of personal jurisdiction) (citing *BMC Software Belg., N.V.*, 83 S.W.3d at 798–99; *Commonwealth Gen. Corp. v. York*, 177 S.W.3d 923, 925 (Tex.2005) (per curiam)); *see also Tri-State Bldg. Specialties, Inc. v. NCI Bldg. Sys., L.P.*, 184 S.W.3d 242, 250 (Tex.App.-Houston [1st Dist.] 2005, no pet.) (relying on *BMC Software Belg., N.V.*, 83 S.W.3d at 798–99 and extending its holding to allegations against corporate officers).

In *BMC Software Belgium*, the claims of plaintiff Marchand depended in part on contentions that the Belgian parent corporation was so essentially "fused" with the Texas-domiciled corporation that the Belgian parent corporation was actually the Texas corporation's alter ego, thus making exercise of personal jurisdiction over the Belgian parent by a Texas court proper. *See BMC Software Belg., N.V.*, 83 W.3d at 798–99. In *IRA Resources, Inc.*, the su-

preme court similarly concluded that allegations of imputed contacts could support exercise of personal jurisdiction over a nonresident defendant if accompanied by proof of an agency relationship between the nonresident and a Texas resident. *See IRA Resources, Inc.*, 221 S.W.3d at 597 (holding that targeted nonresident defendant stood "outside" the transaction on which plaintiff sought relief).

In this case, Capital Finance's jurisdictional allegations against Sinopec Overseas state that Sinopec Overseas was a mere sham and the alter ego of new FIOC in conspiring to defraud Capital Finance and thus invoke the alter-ego theory of imputed contacts recognized in *PHC–Minden*, 235 S.W.3d at 174–75, and *BMC Software Belg., N.V.*, 83 S.W.3d at 799. The jurisdictional allegations against Holder Representative, which state that Holder Representative acted as the agent for the former shareholders of old FIOC in conspiring to defraud Capital Finance, invoke a theory of imputed contacts by agency. *IRA Resources, Inc.*, 221 S.W.3d at 597.

But the single-business enterprise allegations against Sinopec Overseas do not invoke a theory of imputed contacts recognized by the Supreme Court of Texas. Though it recognized the alter-ego theory of imputed contacts, in both *PHC–Minden* and *BMC Software Belgium*, and the agency theory of imputed contacts in *IRA Resources*, the court has "never endorsed" the single-business enterprise theory of imputed contacts alleged by Capital Finance against Sinopec Overseas. *See PHC–Minden*, 235 S.W.3d at 173–74 (stating same and criticizing appellate court's analysis of theory as failing to distinguish between "veil-piercing for purposes of liability ('substantive veil-piercing')" and "imputing one entity's contacts to another for jurisdictional purposes ('jurisdictional veil-piercing')"); *see also S. Union Co. v. City*

*of Edinburg,* 129 S.W.3d 74, 87 (Tex.2003) (declining to decide "whether a theory of 'single business enterprise' is a necessary addition to Texas law regarding the theory of alter ego for disregarding the corporate structure").

In *BMC Software Belgium,* Marchand's allegations imputed the actions of one corporation to another; to exercise personal jurisdiction over the Belgian parent would therefore require that the Texas trial court disregard the legal distinctions between the parent and the Texas-domiciled businesses—and thus violate the well-settled Texas presumption that separate corporations are distinct entities. *See BMC Software Belg., N.V.,* 83 S.W.3d at 798–99.

■ To conform the jurisdictional inquiry to the requirements of due process when, as here, a plaintiff alleges imputed contacts by an alter-ego foreign defendant or a defendant-agent, the following factors define the minimum-contacts analysis that will determine whether Texas may properly exercise personal jurisdiction over that defendant:

> To "fuse" the parent company and its subsidiary for jurisdictional purposes, the plaintiffs must prove the parent controls the internal business operations and affairs of the subsidiary. But the degree of control the parent exercises must be greater than that normally associated with common ownership and directorship; the evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice.

*PHC–Minden,* 235 S.W.3d at 175 (quoting *BMC Software Belg., N.V.,* 83 S.W.3d at 799).

### 3. *Specific vs. General Jurisdiction*

■ The defendant's contacts with the Texas forum can give rise to either general jurisdiction or specific jurisdiction. *IRA Resources, Inc.,* 221 S.W.3d at 596; *BMC Software,* 83 S.W.3d at 795; *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 227 (Tex.1991); *Xenos Yuen,* 227 S.W.3d at 200.

■ Specific jurisdiction arises when the claims in question arise from or relate to the defendant's purposeful contacts with Texas. *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806 (Tex.2002). Specific-jurisdiction analysis of minimum-contacts focuses on the relationship among the defendant, Texas, and the litigation. *IRA Resources, Inc.,* 221 S.W.3d at 596 (citing *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 575–76 (Tex.2007) (in turn citing *Guardian Royal Exchange,* 815 S.W.2d at 228)).

■ In contrast, general jurisdiction is based "solely on the defendant's continuous and systematic" contacts with Texas and is not defeated, therefore, when the plaintiff's cause of action does not arise from or relate to activities conducted within the forum. *See PHC–Minden,* 235 S.W.3d at 168–69 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 1873, 80 L.Ed.2d 404 (1984)). Because general jurisdiction is "dispute-blind," however, analysis of minimum contacts is "more demanding" and requires a showing that the defendant conducted "substantial activities" in Texas. *Id.* at 168 (citing *CSR Ltd.,* 925 S.W.2d at 595).

### C. Standards and Scope of Review

#### 1. *Burdens of Proof—General Rule*

■ In a suit against a nonresident defendant,[18] the initial burden is on the

---

**18.** The Long–Arm Statute defines a "nonresi- dent" to include "an individual who is not a

plaintiff, in this case, Capital Finance, to plead sufficient allegations to bring the defendant within the provisions of the Texas long-arm statute. *See BMC Software Belg., N.V.,* 83 S.W.3d at 793. The jurisdictional inquiry must yield to the constitutional command that " 'exercise of personal jurisdiction must be fundamentally fair.' " *PHC–Minden,* 235 S.W.3d at 174 (quoting with approval, *In re Baan Co. Sec. Litig.,* 245 F.Supp.2d 117, 129 (D.D.C. 2003)). The jurisdictional inquiry must, therefore, be separate and distinct from the underlying merits; a court that equates the substantive merits with personal jurisdiction will violate the fairness considerations that form the basis of due process mandates. *See id.,* 235 S.W.3d at 174; *Michiana Easy Livin' Country,* 168 S.W.3d at 790–91 (rejecting relevancy, for purposes of specific jurisdiction, of inquiry into defendant's directing a tort in Texas because theory improperly "equat[es]" jurisdictional inquiry with "underlying merits"); *Nat'l Indus. Sand Ass'n,* 897 S.W.2d at 773 (declining to authorize exercise of personal jurisdiction based solely on allegations of conspiracy). In reviewing Capital Finance's jurisdictional allegations, therefore, we ask only whether they are sufficient to invoke exercise of personal jurisdiction over Sinopec Overseas and Holder Representative without regard to the merits. *See PHC–Minden,* 235 S.W.3d at 174.

When a plaintiff meets its pleading burden, the burden of proof ordinarily shifts to the nonresident defendant, who must then negate all possible grounds for personal jurisdiction alleged by the plaintiff, *see Am. Type Culture Collection, Inc.,* 83 S.W.3d at 807, who must then present a "compelling case" that exercise of jurisdiction would not be fair and just. *See Glatt-*

*ly v. CMS Viron Corp.,* 177 S.W.3d 438, 450 (Tex.App.-Houston [1st Dist.] 2005, no pet.).

**2. Burden of Proof—Exception for Imputed, or "Veil–Piercing" and Alter-Ego, Contacts**

An exception to the general rule arises, however, when, as here, a plaintiff's assertion of jurisdiction depends on imputing the actions of a resident to a nonresident. In this case, Capital Finance claims that Sinopec Overseas was created as "a sham to perpetrate a fraud" and acted as a single enterprise with new FIOC or alter ego of new FIOC or both, by participating expressly and conspiratorially, in (1) paying "unlawful benefits" to DeCamillis, (2) not paying Capital Finance, and (3) removing assets from the reach of Capital Finance.

As noted, Texas may properly exercise personal jurisdiction over a nonresident defendant company that has an alter-ego relationship with a company with a Texas residence, through evidence showing that they are one and the same, such that the Texas-domiciled company's "doing business" may be attributed to the nonresident company. *See PHC–Minden,* 235 S.W.3d at 175 (stating *BMC Software Belgium* test for imputed contacts); *BMC Software Belg., N.V.,* 83 S.W.3d at 798–99; *Commonwealth Gen. Corp.,* 177 S.W.3d at 925; *see also Tri–State Bldg. Specialties, Inc.,* 184 S.W.3d at 250 (relying on *BMC Software Belg., N.V.,* 83 S.W.3d at 798–99, and applying its holding and rationale to allegations against corporate officers).

Because two corporations are presumptively distinct and separate, the supreme court held in *BMC Software Belgium* that, to disregard that "corporate fiction" and

resident of [Texas]" and "a foreign corporation, joint-stock company, association, or partnership." TEX. CIV. PRAC. & REM.CODE ANN. § 17.041 (Vernon 1997).

thus "fuse" the entities for purposes of jurisdiction, the plaintiff had to prove his alter-ego claims at the special-appearance hearing, and further held that Texas could not exercise personal jurisdiction over the nonresident Belgian parent corporation unless Marchand met that burden of proof. *Id.*[19] To prevail against the Belgian parent's special appearance, Marchand had to demonstrate a degree of control by the Belgian parent that exceeded the control "normally associated with common ownership and directorship," by means of evidence showing that "the two entities cease[d] to be separate," which burden Marchand did not meet. *Id.* at 798–99; *see also PHC–Minden,* 235 S.W.3d at 175 (quoting *BMC Software Belgium* "factors" controlling assertions of imputed contacts, 83 S.W.3d at 799).

In *Tri–State Building Specialties,* this Court applied *BMC Software Belgium* principles and rejected a plaintiff's attempt to exercise personal jurisdiction over nonresident officers of an allegedly defunct corporation. *Tri–State Bldg. Specialties, Inc.,* 184 S.W.3d at 249–50. Recognizing that *BMC Software Belgium's* underlying rationale was "the presumption of separate identity between corporations," 83 S.W.3d at 798, and that fundamental Texas law likewise presumes that officers and shareholders of a corporation have legally separate identities that normally insulate against potential liability for corporate

acts, this Court logically extended the *BMC Software Belgium* burden of proof to the *Tri–State* plaintiff's jurisdictional allegations. *Tri–State Bldg. Specialties, Inc.,* 184 S.W.3d at 250; *see also Wolf v. Summers–Wood, L.P.,* 214 S.W.3d 783, 788 (Tex.App.-Dallas 2007, no pet.) (applying *BMC Software Belgium* burden to plaintiff claiming "corporate fiction or sham," also citing *Tri–State Bldg. Specialties, Inc.,* 184 S.W.3d at 250).

■ Settled law *always* presumes that corporations exist as separate entities, and that corporate officers are separate from their corporation. That law and the due process fairness considerations emphasized most recently in *PHC-Minden* warrant imposing the burden of proof on the plaintiff to set aside those presumptions before Texas courts may properly exercise personal jurisdiction in conformity with the requirements of due process. *PHC-Minden,* 235 S.W.3d at 174–75; *Tri–State Bldg. Specialties, Inc.,* 184 S.W.3d at 250. In accordance with *Commonwealth General, BMC Software Belgium,* and our own precedent in *Tri–State Building Specialties,* therefore, we hold that Capital Finance had the burden to prove its allegations that Sinopec Overseas acted as alter ego of new FIOC.

### 3. *Burden of Proof—Exception for Contacts Imputed based on Agency*

**19.** In imposing this burden of proof on a plaintiff at the special-appearance hearing and thus creating an exception to the general rule that the burden of proof shifts to the defendant, the supreme court's decision in *BMC Software Belgium* followed precedents by the federal courts of Texas and our sister appellate courts. *See BMC Software Belg., N.V.,* 83 S.W.3d 789, 799 (Tex.2002) (citing with approval *Walker v. Newgent,* 583 F.2d 163, 167 (5th Cir.1978), *Gutierrez v. Raymond Int'l, Inc.,* 484 F.Supp. 241, 253 (S.D.Tex. 1979), *Conner v. ContiCarriers & Terminals,*

*Inc.,* 944 S.W.2d 405, 419 (Tex.App.-Houston [14th Dist.] 1997, no writ), and *3–D Elec. Co. v. Barnett Constr. Co.,* 706 S.W.2d 135, 139 (Tex.App.-Dallas 1986, writ ref'd n.r.e.)); *see also Tri–State Bldg. Specialties, Inc. v. NCI Bldg. Sys., L.P.,* 184 S.W.3d 242, 250 (Tex. App.-Houston [1st Dist.] 2005, no pet.) (noting that *BMC Software Belgium* created exception to rule that burden of proof shifts to defendant challenging personal jurisdiction once plaintiff's pleadings allege sufficient jurisdictional facts for personal jurisdiction).

As against Holder Representative, Capital Finance's conspiracy and fraudulent transfer claims allege that Holder Representative acted as agent for former FIOC's equity holders with the express, additional purpose of assisting to remove assets beyond the reach of Capital Finance. Much like the prohibition that bars a Texas court from disregarding the corporate presumption, well-settled law compels that Texas courts never presume that an alleged agency relationship exists. *See IRA Resources, Inc.,* 221 S.W.3d at 597 (citing *Buchoz v. Klein,* 143 Tex. 284, 184 S.W.2d 271, 271 (1944)). Just as the trial court here would have to *disregard* the settled presumption that corporate entities are distinct and separate in order to credit Capital Finance's alter-ego allegations, as addressed above, the trial court would have to *indulge* a prohibited presumption—that an agency relationship exists—in order to exercise personal jurisdiction based on Capital Finance's allegations that Holder Representative acted as agent for former FIOC's equity holders when it committed what Capital Finance contends is fraud and conspiracy. *See Buchoz,* 184 S.W.2d at 271; *see also Meader v. IRA Res., Inc.,* 178 S.W.3d 338, 345–46 (Tex. App.-Houston [14th Dist.] 2005, no pet.) (noting that "the law ... does not presume agency," in upholding implied finding by trial court that Texas resident was not nonresident's agent for purposes of personal jurisdiction).[20]

Crediting the plaintiff's alter-ego claims in *PHC–Minden* and *BMC Software Belgium,* and the corporate-officer liability claims in *Tri–State Building Specialties,* without supporting proof and for purposes of personal jurisdiction, would have improperly shifted the jurisdictional inquiry to the underlying merits of the case, in violation of due process. *See PHC–Minden,* 235 S.W.3d at 174. The legal presumptions and due process concerns that underscore *PHC–Minden, BMC Software,* and *Tri–State Building Specialties* apply with equal force and logic to Capital Finance's allegations that impute agency-based contacts in support of exercise of personal jurisdiction over Holder Representative. To credit Capital Finance's agency-premised allegations would violate due process by diverting the trial court's jurisdictional inquiry to the merits of the lawsuit, *see PHC–Minden,* 235 S.W.3d at 174, and would also have required the trial court to set aside the well-settled prohibition against presuming that an agency relationship exists. *See IRA Resources, Inc.,* 221 S.W.3d at 597; *Meader,* 178 S.W.3d at 338, 345–46.

The settled law that *never* presumes that an agency relationship exists, as well as the due process considerations emphasized in *PHC-Minden,* 235 S.W.3d at 174–75, compel that the plaintiff bear the burden to prove that an agency relationship exists. Imposing that burden on the plaintiff ensures that Texas courts exercise personal jurisdiction in conformity with the requirements of due process. *IRA Resources, Inc.,* 221 S.W.3d at 597. In accordance with *IRA Resources,* we therefore hold that Capital Finance also had the burden to prove the agency theory of imputed contacts alleged in its live pleadings, i.e., that Holder Representative acted as agent for former FIOC's equity holders in conspiring to defraud Capital Finance in order that the trial court might properly

**20.** The supreme court granted review in *IRA Resources, Inc. v. Griego,* 221 S.W.3d 592, 596 (Tex.2007), because the holding of the court of appeals contradicted *Meader v. IRA Re-* *sources, Inc.,* 178 S.W.3d 338, 345–46 (Tex. App.-Houston [14th Dist.] 2005, no pet.). *See IRA Resources, Inc.,* 221 S.W.3d at 594.

assert personal jurisdiction over Holder Representative.

### 3. Review of Trial Court's Ruling and Implied Findings

■ Whether a court has personal jurisdiction over a defendant is a question of law subject to de novo review. *Id.*, 221 S.W.3d at 595 (citing *BMC Software Belg., N.V.*, 83 S.W.3d at 794); *Xenos Yuen*, 227 S.W.3d at 201. Though inquiring into the merits would violate due process, *see PHC–Minden*, 235 S.W.3d at 174, a trial court must frequently resolve preliminary questions of fact to determine the jurisdictional question. *BMC Software Belg., N.V.*, 83 S.W.3d at 794.

■ When, as here, the trial court issues no findings of fact and conclusions of law in support of its rule 120a ruling, we must infer "all facts necessary to support the judgment," on condition that they are raised by the pleadings and have support in the record of the special-appearance hearing. *See id.* at 795; *Xenos Yuen*, 227 S.W.3d at 201; *Tri–State Bldg. Specialties, Inc.*, 184 S.W.3d at 246 (citing *Am. Type Culture Collection, Inc.*, 83 S.W.3d at 806)

(stating that reviewing court should presume that trial court resolved all factual disputes in favor of its judgment if trial court issues no findings of fact).

■ We consider only the evidence that favors the trial court's decision in addressing evidentiary challenges when the trial court issues no findings of fact or conclusions of law, and we may sustain the ruling on any reasonable theory that is consistent with the evidence and the applicable law.[21] *See Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex.1990); *Lemons v. EMW Mfg. Co.*, 747 S.W.2d 372, 373 (Tex. 1988); *Burnett v. Motyka*, 610 S.W.2d 735, 736 (Tex.1980); *cf. Whaley v. Cent. Church of Christ*, 227 S.W.3d 228, 231 (Tex.App.-Houston [1st Dist.] 2007, no pet.) (holding that appealing party must demonstrate that trial court's judgment cannot be sustained on any theory raised by the evidence). Though implied in support of the judgment, the trial court's findings are not conclusive when, as here, the appellate record includes both the reporter's and clerk's records, and the sufficiency of the evidence may be challenged on ap-

---

21. We note that Sinopec Overseas has objected, on appeal, to Capital Finance's reliance on certain evidence presented to the trial court during the special-appearance hearing, on the grounds that the trial court sustained objections to that evidence in the course of the hearing. Yet, the order sustaining the special appearances refers to the evidentiary objections presented by all parties and then specifies that the court *"overrule[d] all of the objections"* and sustained the special appearances after considering "the special-appearance briefing, *the evidence submitted*, the pleadings, the arguments of counsel and the applicable law." (Emphasis added.)

A judgment or order that is rendered in writing and signed by the trial judge becomes the official judgment of the court. *Harrington v. Harrington*, 742 S.W.2d 722, 724 (Tex.App.-Houston [1st Dist.] 1987, no writ). Recitals in a judgment or signed

order of the court thus control over conflicting recitals in the record. *See Hamilton v. Empire Gas & Fuel Co.*, 134 Tex. 377, 110 S.W.2d 561, 566 (1937) ("[D]ocket entries, ... affidavits, and other like evidence, can neither change nor enlarge judgments or orders as entered in the minutes of the court."); *In re JDN Real Estate–McKinney L.P.*, 211 S.W.3d 907, 914 n. 3 (Tex.App.-Dallas 2006, orig. proceeding) (holding that written order controlled over conflicting oral pronouncement); *Harrington*, 742 S.W.2d at 724 (resolving conflict between judgment and docket entry in favor of judgment).

Because the trial court's order expressly overruled all parties' objections, we consider all evidence submitted to the trial in addressing Capital Finance's issues on appeal.

peal. *BMC Software*, 83 S.W.3d at 795.[22]

### Special Appearance—Application of Principles to This Case

### A. Trial Court's Ruling and Implied, Supporting Findings

The trial court's order sustaining the special appearances of Sinopec Overseas and Holder Representative grants only that requested relief and thus sheds no light on the trial court's reasoning. Pursuant to the recent supreme-court authority addressed above, however, the burden of proof remained with Capital Finance to prove the imputed-contacts theories—alter ego and agency—on which it relied to support its contentions that Texas could properly exercise personal jurisdiction over Sinopec Overseas and Holder Representative to address Capital Finance's fraud and conspiracy claims.[23]

■■■■■ "The alter-ego theory permits a plaintiff to disregard the corporate fiction when a corporation is organized and operated as a mere tool or business conduit of another corporation," *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex.1986), and proof of imputed contacts based on this theory may serve as a basis for exercise of jurisdiction over a nonresident. *See PHC–Minden*, 235 S.W.3d at 172–76. Alter ego is generally resolved by the trier of fact, in this case, the trial court at the special-appearance hearing. *See Castleberry*, 721 S.W.2d at 277. An agency-based theory of imputed contacts may also serve as a basis for exercise of personal jurisdiction over a foreign defendant on proper proof. *See IRA Resources, Inc.*, 221 S.W.3d at 597. Like alter ego, agency involves resolution of issues of fact. *See Novamerican Steel, Inc. v. Delta Brands, Inc.*, 231 S.W.3d 499, 511 (Tex.App.-Dallas 2007, no pet.). The essential feature of agency is the right of control. *Id.* (citing *Schott Glas v. Adame*, 178 S.W.3d 307, 315 (Tex.App.-Houston [14th Dist.] 2005, pet. denied) (rejecting agency theory of imputed contacts because nonresident manufacturer did not control details of resident sales representative's sales)).

### 1. *Sinopec Overseas: Impliedly Found not Alter Ego of new FIOC*

Because the trial court sustained the special appearance of Sinopec Overseas, we may infer adverse findings by the trial court that Capital Finance did not meet its burden to prove its allegations that Sinopec Overseas acted as new FIOC's alter ego and was subject to personal jurisdiction in Texas for that reason. *See Am. Type Culture Collection*, 83 S.W.3d at 806; *Tri–State Bldg. Specialties, Inc.*, 184 S.W.3d at 246. Stated otherwise, the trial court impliedly found no alter-ego relationship between Sinopec Overseas and new FIOC. Given Capital Finance's alter-ego pleadings against Sinopec Overseas and the governing law, the trial court's adverse

---

**22.** The standard of review compels that we view only the evidence that *favors* the trial court's judgment when there are no findings of fact, and the record contains the reporter's record, as here. *E.g., Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex.1990). Accordingly, our review does not encompass a factual-sufficiency challenge, which requires that we consider *all* the evidence before the trial court. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

**23.** We decline to address Capital Finance's assertions of single-business enterprise because the supreme court has not recognized this as a valid theory of imputed contacts for purposes of a trial court's exercise of jurisdiction. *See PHC–Minden, L.P. v. Kimberly–Clark Corp.*, 235 S.W.3d 163, 173–74 (Tex.2007). Because the supreme court has never recognized the successor-liability theory of imputed contacts asserted by Capital Finance, *see id.,* we may infer that the trial court rejected that theory as a matter of law on that basis.

finding is reasonable. *See Worford,* 801 S.W.2d at 109; *Whaley,* 227 S.W.3d at 231.

### 2. *Holder Representative: Impliedly Found not Agent for Former FIOC Equity Holders*

Because the trial court sustained the special appearance of Holder Representative, we may infer adverse findings by the trial court that Capital Finance did not meet its burden to prove its allegations that Holder Representative acted as agent for the former FIOC equity holders and was subject to personal jurisdiction in Texas for that reason. *See IRA Resources, Inc.,* 221 S.W.3d at 597. Stated otherwise, the trial court impliedly found that Holder Representative did not act as agent for the former FIOC equity holders. Given Capital Finance's agency pleadings against Holder Representative and the governing law, the trial court's adverse finding is reasonable. *See Worford,* 801 S.W.2d at 109; *Whaley,* 227 S.W.3d at 231.

### B. Whether the Record Supports the Trial Court's Implied, Adverse Findings

We next consider whether the record supports the implied findings that we have attributed to the trial court in support of its having sustained the special appearances of Sinopec Overseas and Holder Representative. *See Worford,* 801 S.W.2d at 109; *Lemons,* 747 S.W.2d at 373; *Burnett,* 610 S.W.2d at 736. The dispositive inquiry is whether the trial court's implied findings are consistent with the evidence and the applicable law. *Worford,* 801 S.W.2d at 109; *Lemons,* 747 S.W.2d at 373; *Burnett,* 610 S.W.2d at 736. Accordingly, we determine whether Capital Finance has demonstrated on appeal that the trial court's order sustaining the special appearances cannot be sustained on any theory raised by the evidence. *See Whaley,* 227 S.W.3d at 231.

### 1. *Imputed–Contacts Allegations against Both Sinopec Overseas and Holder Representative*

■ Capital Finance's claims of conspiracy and fraud by Sinopec Overseas and Holder Representative, and its claims that Texas may properly exercise personal jurisdiction to address those claims, depend on allegations that these companies structured the merger transaction in order to conceal or divert funds from creditors of former FIOC. On appeal, Capital Finance summarizes its contentions by contending that the record establishes that both companies acted as "single purpose shells" and had "joint control" over the undistributed proceeds in the escrow fund. Capital Finance argues that one purpose of the escrow fund was to provide for undisclosed liabilities like Capital Finance's claim for its unpaid finder's fee commission, and that Sinopec and Holder Representative had joint control over the undistributed proceeds of the merger transaction because both signed the escrow agreement. On reviewing the record in the mandatory light that supports the trial court's ruling, *see Worford,* 801 S.W.2d at 109, we conclude that Capital Finance's contentions have no support in the record.

Capital Finance subpoenaed the only witnesses who testified at the special-appearance hearing. The first witness was Charles Wilson, a mergers-and-acquisitions attorney and a former partner with the Houston office of Vinson & Elkins, L.L.P. Wilson was hired by SIPC, which is not a party to this lawsuit, for advice regarding negotiations for the acquisition of former FIOC and the due-diligence investigations relating to the transaction. Wilson acknowledged that his work may have benefitted Sinopec Overseas, the named purchaser in the merger agreement, but

confirmed that he was hired by SIPC and worked only for SIPC.

Under direct examination by Capital Finance, Wilson testified that the procedures conducted and the documents generated were those normally associated with mergers-and-acquisitions practice, that no one from Sinopec Overseas had ever traveled to Texas before or in connection with the merger transaction, and that the purchase and escrow funds were wired directly to Citibank in New York City without ever passing through Texas.

Under cross-examination by counsel for Sinopec Overseas, Wilson stated that his law firm did not form either the Bermuda-based Sinopec Overseas or the Delaware-based new FIOC, and that he had never conversed with anyone about delaying, hindering, or defrauding the creditors of former FIOC. Wilson reaffirmed that new FIOC acquired the assets and liabilities of former FIOC; that Sinopec Overseas acquired no assets or liabilities of former FIOC, which were assumed by new FIOC; and that former FIOC's assets and liabilities did not merely "pass through" Sinopec Overseas to new FIOC.

Regarding the escrow agreement, which he drafted, Wilson denied "specifically earmark[ing]" funds for the benefit of Capital Finance and denied having any discussions regarding hiding, delaying, hindering and defrauding any creditors of former FIOC. Wilson also confirmed that he was not aware of Capital Finance's agreement with former FIOC until after Capital Finance asserted the claim that led to this litigation.

Relevant to Capital Finance's contention that both Sinopec Overseas and Holder Representative had control over undistributed proceeds in the escrow fund, Wilson agreed that a purpose of the escrow agreement was to cover undisclosed liabilities of former FIOC. As the agreement confirms, however, the liabilities contemplated were future, and therefore undisclosed, breaches of former FIOC's warranties stated in the agreement. According to Wilson, the finder's fee commission was a known liability of former FIOC, and thus a retained liability to be allocated to and assumed by the entity that was ultimately known as new FIOC, in accordance with provisions of the merger agreement. Capital Finance acknowledges that new FIOC assumed such liabilities under the merger agreement, having relied on those terms in its successor liability claims against new FIOC. The documentary evidence and the testimony further confirm that an additional purpose of the escrow was to provide for as-yet-unpaid cash payments to equity holders of former FIOC, whose interests Holder Representative was created to protect.

Regarding the finder's fee commission, we note that any fee due to Capital Finance was contingent on completion of the merger transaction, and that a finder's commission was actually paid, though not to Capital Finance. Furthermore, with the exception of Capital Finance's letter agreement with former FIOC, testimony at the hearing and the documentary evidence refer only to a finder's fee commission due and ultimately paid to Mrs. DeCamillis.

William K. Bosche, the chief financial officer of former FIOC, also testified at the rule 120a hearing. Bosche worked as a consultant to new FIOC after the merger. Though he testified extensively concerning negotiations of the merger transaction, nothing in Bosche's testimony shows or suggests that he had a working relationship with either Sinopec Overseas or Holder Representative after he began working as a consultant to new FIOC. Bosche explained that he took direction from and reported to either new FIOC, to the largest extent, or from SIPC or SIPC

affiliates, to a lesser extent, but not from Sinopec Overseas. Though Sinopec Overseas was formed before the actual merger transaction, Bosche denied that he had ever met with any Sinopec Overseas representatives in Houston before the transaction, that any assets of former FIOC were transferred out of Texas after the merger, and that any directors of former FIOC became directors of new FIOC. Bosche conceded some knowledge that Holder Representative planned to contest an earlier tax return, but clarified that the contest would relate to taxes paid in 2003, before the merger, and therefore would have some bearing on the amount of funds available in the escrow account that Holder Representative held to safeguard the interests of unpaid equity holders of former FIOC.

Testimony by former FIOC's accountant established that he prepared tax returns for former FIOC and then took on an assignment for Holder Representative after it was formed. As part of that assignment, the accountant reviewed former FIOC's 2003 tax returns and, later, its 2004 tax returns. This was the extent of his responsibility, on which he spent about 15 hours. The accountant conferred with Bosche, but denied any contact with Holder Representative's tax lawyer. Both the accountant and the former corporate secretary for former FIOC, whom Capital Finance also summoned to testify, denied ever doing any work for Sinopec Overseas.

Our review of the record of the special appearance hearing and the documentary evidence reveals nothing to support Capital Finance's contention that Sinopec Overseas and Holder Representative had joint control over the undistributed proceeds of the merger transaction, to the extent necessary to support Capital Finance's imputed-contacts allegations, despite those entities' having signed the escrow agreement.

It is undisputed that the escrow agreement arose from the merger agreement and the MOU, and that neither of these documents accords joint control over the undistributed proceeds to Sinopec Overseas and Holder Representative to the extent necessary to support Capital Finance's imputed-contacts allegations of alter ego and agency. In addition, the merger and escrow agreements strictly limit these parties' access to the escrow funds to (1) breaches of former FIOC's warranties stated in the merger agreement, in the case of Sinopec Overseas; and (2) claims by equity holders of former FIOC, in the case of Holder Representative.

We turn next to Capital Finance's individual allegations against Sinopec Overseas and Holder Representative.

### 2. Sinopec Overseas as Alter Ego of New FIOC

 To warrant exercise of personal jurisdiction over Sinopec Overseas, Capital Finance had to prove its imputed-contacts allegation that Sinopec Overseas was new FIOC's alter ego—despite new FIOC's not having come into existence until after the merger agreement was signed, and thus over three months after Sinopec Overseas was formed.

Capital Finance's imputed-contacts contentions hinge in significant part on the alleged status of Sinopec Overseas as the purchaser of former FIOC and alleged employer of accountants and lawyers in Texas, who necessarily benefitted Sinopec Overseas in the documents they drafted or reviewed. It is undisputed that Sinopec Overseas is the "buyer" contemplated by the MOU and identified by the merger agreement, and that it was formed shortly after the MOU. But, no witness presented by Capital Finance at the rule 120a hearing attested to a relationship with Sinopec

Overseas. When questioned, moreover, the witnesses denied ever having a relationship with, taking direction from, or reporting to, Sinopec Overseas.

The responses of Bosche, former FIOC's chief financial officer, to questioning by Capital Finance concerning new FIOC's involvement with Sinopec Overseas have particular importance. Bosche worked as a consultant to new FIOC, which, Capital Finance contends, had an alter-ego relationship with Sinopec Overseas. In response to vigorous, repeated questioning, however, Bosche insisted that, in exercising his responsibilities as consultant to new FIOC, he took direction mostly from new FIOC, and, to a lesser extent, or from SIPC or SIPC affiliates, but not from Sinopec Overseas.

As further support of its contention that Sinopec Overseas "controlled" the escrow account, Capital Finance points out that (1) the escrow agreement gives Sinopec Overseas "the right to disbursements" from escrow funds for excess transaction costs, which include finder's and broker's fees, and that (2) Sinopec Overseas has "the right to disbursements" from escrow funds for "inaccuracies" in the representations made by former FIOC in the merger agreement. With respect to the second point, Capital Finance notes specifically that the merger agreement includes a representation that "no broker, finder, or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated" by the merger, except as disclosed in the merger agreement, and that the merger agreement disclosed a finder's-fee commission due to Mrs. DeCamillis and Moyes & Company and provided copies of the agreements pertaining to those finder's fees.

But Capital Finance does not explain how the "right to general disbursements" of Sinopec Overseas described in the escrow agreements, constitutes proof that Sinopec Overseas was "fused with" new FIOC and was, therefore, its alter ego, thus justifying exercise of personal jurisdiction under minimum-contacts analysis. *See PHC–Minden*, 235 S.W.3d at 175. None of the terms on which Capital Finance relies demonstrates that Sinopec Overseas controlled the "internal business operations and affairs" of new FIOC, to the extent that Sinopec Overseas and new FIOC "cease[d] to be separate," so that the "corporate fiction" might properly "be disregarded." *Id.* (quoting *BMC Software Belg., N.V.*, 83 S.W.3d at 799).

Finally, that Sinopec Overseas owns one-hundred percent of the stock of its subsidiary, new FIOC, and that the companies may share officers is likewise not dispositive of the jurisdictional inquiry. *BMC Software Belg., N.V.*, 83 S.W.3d at 799 (" '[A] subsidiary corporation will not be regarded as the alter ego of its parent merely because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of the control that stock ownership gives to stockholders.' ") (quoting *Gentry v. Credit Plan Corp.*, 528 S.W.2d 571, 573 (Tex.1975)).

Like the plaintiffs in *PHC–Minden*, *BMC Software Belgium*, and *Tri–State Building Specialties*, Capital Finance did not meet its burden here to substantiate its alter-ego and imputed-liability allegations by demonstrating that (1) Sinopec Overseas "controlled the internal business operations and affairs" of new FIOC to the degree that Sinopec Overseas was new FIOC's alter ego, and (2) the entities ceased to be separate, despite their corporate status, and were therefore "fused," so that the trial court could properly disregard their separate corporate entities for purposes of exercising personal jurisdiction over Sinopec Overseas. *See PHC–*

*Minden,* 235 S.W.3d at 175; *BMC Software Belg., N.V.,* 83 S.W.3d at 799; *Tri-State Bldg. Specialties, Inc.,* 184 S.W.3d at 250.

Because the record of this case amply supports the trial court's implied refusal to find that Sinopec Overseas and new FIOC disregarded their separate corporate structures, the trial court properly rejected Capital Finance's attempt to exercise personal jurisdiction over Sinopec Overseas on the grounds that it was new FIOC's alter ego. Crediting Capital Finance's alter-ego allegations for purposes of exercising personal jurisdiction over Sinopec Overseas on this record would not only violate the fairness considerations that underscore due process mandates, which preclude resorting to the substantive merits, but would also violate settled law that preserves the presumption of separate corporate identity. *See PHC–Minden,* 235 S.W.3d at 174. There is no showing of purposeful contact by Sinopec Overseas that exceeds randomness, isolatedness, or fortuity and that demonstrates implied consent to Texas law. *See IRA Resources, Inc.,* 221 S.W.3d at 596–97. Accordingly, Capital Finance has not established that "touchstone" requirement of minimum contacts—purposeful availment—by Sinopec Overseas with Texas. *See Michiana Easy Livin' Country,* 168 S.W.3d at 784; *IRA Resources, Inc.,* 221 S.W.3d at 596–97.

Because Capital Finance failed its burden to demonstrate an alter-ego relationship between Sinopec Overseas and new FIOC, and has thus failed to establish purposeful availment, we hold that Capital Finance has failed to demonstrate, for purposes of imputed contacts to support exercise of specific jurisdiction over Sinopec

Overseas, the requisite relationship among Sinopec Overseas, Texas, and Capital Finance's claims that it was entitled to a finder's fee commission based on its agreement with former FIOC. *See IRA Resources, Inc.,* 221 S.W.3d at 596; *Moki Mac River Expeditions,* 221 S.W.3d at 575–76. Accordingly, we overrule Capital Finance's first issue.

Because Capital Finance failed its burden to demonstrate an alter-ego relationship between Sinopec Overseas and new FIOC, and thus failed to establish purposeful availment, Capital Finance has likewise failed to demonstrate the more rigorous showing that Sinopec Overseas conducted "substantial activities" demonstrating its "continuous and systematic" contacts with Texas, for purposes of imputed contacts to support exercise of general jurisdiction. *See PHC–Minden,* 235 S.W.3d at 168–69. Accordingly, we overrule Capital Finance's issue four.

### 3. *Holder Representative as Agent for Former FIOC Equity Holders*

■■■ To warrant exercise of personal jurisdiction over Holder Representative, Capital Finance had to prove its imputed-contacts allegations that Holder Representative acted as agent for the equity shareholders of former FIOC with the express purpose of assisting to move otherwise recoverable assets beyond the reach of Capital Finance.

Before analyzing Capital Finance's imputed-contacts allegations, however, we address a preliminary response by Holder Representative to Capital Finance's contentions on appeal. Holder Representative emphasizes that it was not a party to the merger transaction, and that it came into existence only after the merger.[24] In

---

**24.** It is undisputed that Holder Representative was formed after the merger agreement was signed and that it was formed solely to

represent the interests of "former FIOC stockholders, option holders, and warrant holders"

reply, Capital Finance protests that Holder Representative was a "party to the sale" because the merger agreement required that Holder Representative execute the escrow agreement, which is essential to the merger agreement. Despite Holder Representative's postmerger formation, Capital Finance further contends that Holder Representative accepted the benefits of preformation acts performed on its behalf by its agents, specifically, the "officers and representatives of [former] FIOC" and, therefore, ratified their actions.

■■■ We agree with Holder Representative that Capital Finance has never alleged that officers and representatives of former FIOC acted on behalf of Holder Representative, or that Holder Representative ratified their actions. Capital Finance's live pleadings allege that Holder Representative acted as agent for former FIOC's equity holders; Capital Finance has never alleged that others acted as agents for Holder Representative. *See Am. Type Culture Collection, Inc.*, 83 S.W.3d at 807 (stating that defendant has burden on special appearance to negate all possible grounds for personal jurisdiction *alleged* by plaintiff). Moreover, a preformation agency relationship is not an appropriate basis on which to premise personal jurisdiction over a foreign nonresident corporation. *See Maurice Pierce & Assoc., Inc. v. Computerage, Inc.*, 608 F.Supp. 173, 176 (N.D.Tex.1985).

We have previously addressed and rejected Capital Finance's chief contention regarding Holder Representative, specifically, that both Holder Representative and Sinopec Overseas had joint control over the escrow fund and "the power" to make the distribution that Capital Finance seeks as compensation.

Analysis of Capital Finance's imputed-contacts allegations—that Holder Representative actively participated in its creation as an agent for former FIOC's equity holders to remove otherwise recoverable assets beyond the reach of Capital Finance—must begin with the date when it was formed, March 24, 2004, and thus after the merger agreement. Capital Finance alleges that Holder Representative was created "as a sham to perpetrate a fraud," but did not explain or provide any evidence to the trial court to explain how an entity that was not formed until after the merger agreement could act before that date as an agent for former FIOC's equity shareholders to accomplish a purpose that is at odds with the terms of the merger agreement approved by those same shareholders. It is undisputed that Holder Representative was formed to hold sale proceeds "for the benefit of former FIOC's shareholders." But those funds are reserved for any unpaid claims they may have. Claims for liabilities incurred by former FIOC were assumed by new FIOC, as Capital Finance acknowledges in its pleadings—by seeking recovery from new FIOC as former FIOC's successor.

Capital Finance's allegations that Holder Representative was a sham and the actual agent of former FIOC's shareholders in perpetrating a fraud, without more, do not permit a finding that Holder Representative was their agent, *see PHC–Minden*, 235 S.W.3d at 174, and agency is never presumed. *IRA Resources, Inc.*, 221 S.W.3d at 597. Holder Representative is a Delaware corporation with headquarters in New York City, which is also the location of the escrow account. To warrant exercise of personal jurisdiction over Holder Representative, Capital Finance had to demonstrate that Holder Representative exercised control over former

---

in funds to be held in the escrow account

contemplated by the MOU.

FIOC's shareholders, as their agent, to a degree sufficient to demonstrate that Holder Representative had minimum contacts with Texas and, thus, purposefully availed itself of the Texas forum. *See id.; Schott Glas*, 178 S.W.3d at 315.

Reviewing the record in the requisite light reveals nothing that supports Capital Finance's imputed-contacts theory that Holder Representative served as the agent of the former FIOC shareholders in order to perpetrate a fraud, in the face of the limits imposed by the merger and escrow agreements on Holder Representative's role. Capital Finance offered no evidence in the trial court that Holder Representative had ever deviated from its limited role as the protector of the interests of former FIOC's equity shareholders in the proceeds of the merger transaction.

The record of this case amply supports the trial court's implied refusal to find that Holder Representative acted as agent for the shareholders of former FIOC to defraud Capital Finance. Accordingly, the trial court properly rejected Capital Finance's attempt to exercise personal jurisdiction over Holder Representative on that basis. grounds that it was former FIOC's shareholders' agent. To credit Capital Finance's agency allegations for purposes of exercising personal jurisdiction over Holder Representative on this record would not only violate the fairness considerations that underscore due process mandates, by impermissibly resorting to the substantive merits, but would also violate settled law that bars presuming that an agency relationship exists. *See IRA Resources, Inc.*, 221 S.W.3d at 597.

There is no showing of purposeful contact by Holder Representative that exceeds randomness, isolatedness, or fortuity and that demonstrates implied consent to Texas law. *Id.* at 596–97. Accordingly, Capital Finance has not established the "touchstone" requirement of minimum con-

tacts—purposeful availment—with the Texas forum, for purposes of exercise of personal jurisdiction over Holder Representative. *See Michiana Easy Livin' Country*, 168 S.W.3d at 784; *IRA Resources, Inc.*, 221 S.W.3d at 596–97.

Because Capital Finance failed its burden to demonstrate an agency relationship between Holder Representative and former FIOC's shareholders, and has thus failed to establish purposeful availment, we hold that Capital Finance has failed to demonstrate, for purposes of imputed contacts to support exercise of specific jurisdiction over Holder Representative, the requisite relationship among Holder Representative, Texas, and Capital Finance's claims that it was entitled to a finder's fee commission based on its agreement with former FIOC. *See IRA Resources, Inc.*, 221 S.W.3d at 596; *Moki Mac River Expeditions*, 221 S.W.3d at 575–76. Accordingly, we overrule Capital Finance's second issue.

Having failed its burden to demonstrate an agency relationship between Holder Representative and the shareholders of former FIOC and having thus failed to establish purposeful availment, Capital Finance has likewise failed to demonstrate the more rigorous showing that Holder Representative conducted "substantial activities" demonstrating its "continuous and systematic" contacts with Texas, as required to support exercise of general jurisdiction. *See PHC–Minden*, 235 S.W.3d at 168–69. Accordingly, we overrule Capital Finance's third issue.

## Conclusion

We affirm the trial court's order sustaining the special appearances filed by Sinopec Overseas and Holder Representative.