BILL MEIER, JUSTICE
I. INTRODUCTION
In one point in this interlocutory appeal, Appellant Old Republic National Title Insurance appeals the trial court's order granting Appellee Robin Goldsmith's motion for special appearance, which challenged the trial court's exercise of personal jurisdiction over her. We will affirm.
II. BACKGROUND
The underlying suit involves the sale of Lisa Bell's residential property ("Property") to Chitra Chandrasekaran on July 17, 2012, wherein Chandrasekaran purchased Bell's Property for $215,000. Old Republic is the title company that insured title to this sale of property and brought this suit as Chandrasekaran's subrogee.
Both parties to this appeal agree that Lisa Bell married Bruce Benson in April 2002. Both parties also agree that several years later, in 2009, Benson pleaded guilty to a false claim against the United States government. And both parties agree that as part of Benson's sentence, the United States obtained a restitution lien against Benson's assets. The last of the things that both parties agree upon is that in March 2011, Bell divorced Benson.
According to Old Republic, Bell's divorce decree "awarded" Bell the Property. Old Republic pleaded that the Property was a community asset and that Bell fraudulently misrepresented to Chandrasekaran that the Property was unencumbered and her separate property. Specifically, Old Republic pleaded that Bell failed to inform Chandrasekaran that the Property was encumbered by a federal lien by way of the restitution lien against Benson's assets, which, ostensibly, included "All community property ... incurred during [Bell and Benson's] marriage." Also according to Old Republic, Bell fraudulently signed a "Marital Status Affidavit," wherein Bell "swore that at the time she acquired the Property she was unmarried," in conjunction with the sale of the Property.
Old Republic further pleaded that after the sale of the Property, Chandrasekaran received communications from the United States Department of Justice wherein it demanded payment for, ostensibly, its interest in the Property related to the restitution lien on Benson's assets. According to Old Republic, in order to protect Chandrasekaran, it was "forced to pay the United States [an amount of] $202,574.88, in exchange for a release of the Federal Lien on the Property."
Specifically regarding Goldsmith, in its original, first-amended, and second-amended petitions, Old Republic argued that Bell and Goldsmith defrauded Chandrasekaran and other creditors when Bell transferred the proceeds from the sale of the Property to Goldsmith, a resident of Louisiana.
Goldsmith filed her special appearance motion on January 1, 2014. In her motion, Goldsmith alleged that she has never been a resident of Texas; that she has never engaged in business in Texas; that she has never committed any tort, in whole or in part, within Texas; and that she does not maintain a business in Texas. Goldsmith also alleged that she has no substantial connection with Texas and that Old Republic's claim against her did not arise from and was not related to any activity conducted by her in Texas. Goldsmith also filed an affidavit with her motion wherein she averred that "[t]he check ... that was sent to [Goldsmith] by [Bell] by mail [w]as repayment for money [her] husband and *6 [she] had loaned [Bell] over many years." Goldsmith also averred that she and Bell had been friends for many years and that all monies loaned to Bell were made "[informally], interest free, with no security or collateral and with no promissory note." Goldsmith also averred that until she received a copy of this present lawsuit, she "had no knowledge of any claim by the United States government [against Bell and that she had] never had any knowledge of any serious financial difficulty of [Bell], or known of any alleged garnishment of her assets by the United States."
In its written responses to Goldsmith's motion, Old Republic argued that the trial court had specific jurisdiction over Goldsmith because under the Uniform Fraudulent Transfers Act ("UFTA"), Goldsmith was "the first transferee of the asset or the person for whose benefit the transfer was made" when Bell transferred the proceeds from sale of the Property to Goldsmith. Moreover, Old Republic argued that Goldsmith was considered an "insider" for purposes of the UFTA. Old Republic also contended that it had evidence that Goldsmith was aware of Bell's financial troubles in that during Bell's divorce, in her first-amended inventory, Bell listed Goldsmith as a creditor in the amount of $24,500. Old Republic also alleged that Bell's second-amended inventory from her divorce listed Goldsmith as possessing a secured interest in Bell's 2011 Nissan Sentra. Old Republic further alleged that in September of 2010, liens were recorded on vehicles owned by Bell in Goldsmith's favor.
Prior to holding a hearing on Goldsmith's special-appearance motion, the trial court allowed for limited discovery, including allowing Old Republic to depose Goldsmith and propound interrogatories. In her deposition, Goldsmith said that she and Bell had been friends since the late 1970s. Goldsmith averred that she began loaning Bell money in August 2009 because Bell was in a "financial bind" due to her divorce with Benson.
Goldsmith also said that she knew that the United States had filed a lawsuit against Benson at the time she began to loan Bell money. Goldsmith averred, however, that she was unaware of any efforts to garnish either Bell or Benson's assets, and she specifically said that she was unaware that the United States had ever sought a lien on the Property. Goldsmith said that she assumed that the money she loaned to Bell would be going to "a Texas bank because [Bell] lives in Texas." Goldsmith said that the money she loaned to Bell was for living expenses, for expenses related to Bell attending nursing school, and for attorney's fees related to Bell's divorce.
Specifically speaking to the monies from the sale of the Property, Goldsmith said that Bell had told her that she was "going to give [her] whatever [Bell received] from" the sale of the Property and that the purpose of giving the money to Goldsmith was to repay the Goldsmiths for the previous loans. According to Goldsmith, the reason that the amount exceeded Goldsmith's documented amount that she had loaned Bell was that Bell wanted to give the extra money to Goldsmith because Bell had expressed that she "was eternally grateful that [the Goldsmiths] had helped her, that [they] had put her on a path of an earning potential." Goldsmith averred that Bell paid her the more than $200,000 via a cashier's check. When asked why Bell had paid her using a cashier's check, Goldsmith said that she had never discussed that issue with Bell. Goldsmith also said that Bell had sent her the cashier's check and that she had deposited the check in a bank in Louisiana. Goldsmith also averred that within days of receiving the money from *7 Bell, she had deposited nearly $150,000 of the monies in a mutual fund account so that the money would earn interest.
Goldsmith said that later she began to loan money to Bell again related to this lawsuit and for living expenses. Goldsmith also said that the reason Bell had recorded a lien on her vehicle in Goldsmith's favor in 2011, was for "financial planning" related to Bell's estate because Bell had been diagnosed with cancer. Goldsmith averred, however, that she was not sure where the lien had been filed or who had actually filed the lien, but that she assumed the lien was registered in Texas.
Specifically speaking to whether she and Bell had discussed the federal government trying to take or seize any of Bell's assets, Goldsmith said that she and Bell had discussed "a lot of things," and although she and Bell had "brainstorm[ed]" about things that both of them worried about, Goldsmith averred that she and Bell had "never in any way talked about doing something that was illegal or wrong, period." Goldsmith said that Bell was afraid in "a global nature" because Bell had wrongly believed that she was married to "an honest man" when she was not.
In many of her responses to Old Republic's interrogatories, Goldsmith stated that Old Republic's requests were irrelevant because the trial court in Bell's divorce had determined that the Property was Bell's separate property under the inception of title doctrine and that the federal lien could not have attached to the Property as a matter of law.
At the time the trial court held its June 25, 2015 special-appearance hearing, Old Republic had specifically alleged, in its second-amended petition, that Bell "deposited" the funds she received from the sale of the Property into Goldsmith's account, at a Texas bank, with "the intent to avoid Bell's present and future creditors, including but not limited to Chandrasekaran." At the close of the special-appearance hearing, the trial court stated that it would be granting Goldsmith's motion.
Prior to the trial court signing its written order regarding its special-appearance ruling, Old Republic filed a third-amended petition coupled with a motion urging the trial court to reconsider its ruling on Goldsmith's special appearance. In its third-amended petition, Old Republic argued for the first time that the trial court had general jurisdiction over Goldsmith because Goldsmith had made numerous money transfers to Bell in Texas, had consistently called Bell in Texas for years, and had taken liens on Texas property-Bell's vehicle.
Old Republic also bolstered its specific-jurisdiction claim regarding Goldsmith by pleading that Goldsmith had made more than eighty-one loans to Bell by transferring monies to banks that Goldsmith assumed were Texas banks, that these loans were part of a fraud designed to thwart Bell's creditors, including Chandrasekaran, and that the transfer of monies from sale of the Property was part of this fraud. Specifically, Old Republic pleaded that it was Bell and Goldsmith's "intent to avoid satisfaction of the Federal Lien and to prevent Chandrasekaran from obtaining collection of her claim for reimbursement for payment of the Federal Lien in the amount of $202,574.88." Old Republic also pleaded that Goldsmith received the funds from Bell with "knowledge that Bell was in serious financial difficulty ... by the United States."
The trial court held a hearing on Old Republic's motion to reconsider and later entered an order denying the motion and granting Goldsmith's special appearance. In its order, the trial court said that it had considered Old Republic's third-amended *8 petition but found that it still did not have jurisdiction over Goldsmith. This interlocutory appeal followed.
III. DISCUSSION
In its sole issue, Old Republic argues that the trial court erred by granting Goldsmith's special appearance. Specifically, Old Republic argues that "Goldsmith knowingly participated in a fraudulent transfer scheme with a Texas resident" and that Goldsmith purposely availed herself of Texas jurisdiction because she had "substantial and continuous contacts in furtherance of the fraudulent scheme" such that she "should have reasonably anticipated being haled into a Texas court."
Old Republic argues that we should consider its third-amended petition and that we should not look to the merits of its claim-whether the Property was community or Bell's separate property-in resolving the question of jurisdiction. We conclude that even assuming that Old Republic's third-amended petition is the proper pleading to consider and even assuming that Old Republic has pleaded a cause of action within the parameters of the Texas long-arm statute which Goldsmith has failed to refute factually, Goldsmith's contacts with Texas are too attenuated to constitute purposeful availment and her contacts with Texas were neither continuous nor systematic. Thus, the trial court correctly ruled that it did not have personal jurisdiction over Goldsmith.
A. Standard of Review
Whether a trial court has personal jurisdiction over a defendant is a question of law that we review de novo. Moncrief Oil Int'l Inc. v. OAO Gazprom , 414 S.W.3d 142, 150 (Tex. 2013) ; BMC Software Belgium, N.V. v. Marchand , 83 S.W.3d 789, 794-95 (Tex. 2002). The plaintiff has the initial burden of pleading sufficient allegations to bring a nonresident defendant within the jurisdiction of a Texas court. Moncrief , 414 S.W.3d at 149 ; Kelly v. Gen. Interior Constr., Inc. , 301 S.W.3d 653, 658-59 (Tex. 2010) ; Retamco Operating, Inc. v. Republic Drilling Co. , 278 S.W.3d 333, 337 (Tex. 2009).
If a plaintiff meets its initial burden, "the burden shifts to the defendant to negate all potential bases for personal jurisdiction the plaintiff pled." Moncrief , 414 S.W.3d at 149 ; BMC Software , 83 S.W.3d at 793. A defendant may negate the plaintiff's jurisdictional allegations on either a factual basis or a legal basis. Kelly , 301 S.W.3d at 658-59.
Factually, the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations. The plaintiff can then respond with its own evidence that affirms its allegations, and it risks dismissal of its lawsuit if it cannot present the trial court with evidence establishing personal jurisdiction. Legally, the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction.
Id. at 659 (footnotes omitted).
If a plaintiff does not plead facts bringing a defendant within reach of the Texas long-arm statute, the defendant need only prove that she does not live in Texas to negate jurisdiction. Id. at 658-59 (citing Siskind v. Villa Found. for Educ., Inc. , 642 S.W.2d 434, 438 (Tex. 1982) ).
Before determining the jurisdictional question, a trial court must frequently *9 resolve questions of fact. BMC Software , 83 S.W.3d at 794. If the trial court does not issue findings of fact and conclusions of law, like in this case, all facts necessary to support the judgment that are supported by the evidence are implied. Id. at 795. If the appellate record includes a reporter's record and clerk's record, implied findings are not conclusive and may be challenged for legal and factual sufficiency in the appropriate appellate court. Id.
Due process requires that the jurisdictional inquiry be separate and distinct from the underlying merits. See Capital Fin. & Commerce AG v. Sinopec Overseas Oil & Gas, Ltd. , 260 S.W.3d 67, 81 (Tex. App.-Houston [1st Dist.] 2008, no pet.). When reviewing Old Republic's jurisdictional allegations, we ask only whether the allegations are sufficient to invoke the exercise of personal jurisdiction over Goldsmith without regard to the merits of its claims. See PHC-Minden, L.P. v. Kimberly-Clark Corp. , 235 S.W.3d 163, 174 (Tex. 2007) ; Michiana Easy Livin' Country, Inc. v. Holten , 168 S.W.3d 777, 790-91 (Tex. 2005) (rejecting relevancy, for purposes of specific jurisdiction, of inquiry into defendant's directing a tort in Texas because that theory improperly equates jurisdictional inquiry with underlying merits).
B. Personal Jurisdiction
A trial court has personal jurisdiction over a nonresident defendant if the exercise of jurisdiction is authorized by statute and is consistent with federal and state constitutional due process guarantees. Moncrief , 414 S.W.3d at 149 ; Spir Star AG v. Kimich , 310 S.W.3d 868, 872 (Tex. 2010) ; see also Tex. Civ. Prac. & Rem. Code Ann. Ch. 17. The Texas long-arm statute provides that in addition to other acts that may constitute doing business in Texas, a nonresident does business in this state if the nonresident commits a tort in whole or in part in this state. Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (West 2015)
Although an allegation of jurisdiction may satisfy the Texas long-arm statute, the allegation still may not satisfy the due process requirements under the United States Constitution. Moncrief , 414 S.W.3d at 149. Accordingly, even if a court determines that the facts satisfy the Texas long-arm statute, a court must also examine the facts to determine if the exercise of personal jurisdiction over the defendant comports with due process. See CSR Ltd. v. Link , 925 S.W.2d 591, 594 (Tex. 1996).
Asserting personal jurisdiction over a nonresident defendant comports with due process when (1) the nonresident defendant has minimum contacts with the forum state, and (2) asserting jurisdiction comports with traditional notions of fair play and substantial justice. Retamco Operating , 278 S.W.3d at 337. The minimum contacts analysis requires " 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " Michiana , 168 S.W.3d at 784 (quoting Hanson v. Denckla , 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958) ). The focus is on the defendant's activities and expectations. Am. Type Culture Collection, Inc. v. Coleman , 83 S.W.3d 801, 806 (Tex. 2002), cert. denied , 537 U.S. 1191, 123 S.Ct. 1271, 154 L.Ed.2d 1025 (2003). A defendant's contacts may give rise to either general jurisdiction or specific jurisdiction. See Moncrief , 414 S.W.3d at 150 ; Zinc Nacional, S.A. v. Bouché Trucking, Inc. , 308 S.W.3d 395, 397 (Tex. 2010). Continuous and systematic contacts with Texas may give rise to general jurisdiction, while specific jurisdiction exists when the *10 cause of action arises out of or is related to specific purposeful activities of the defendant in Texas. Moncrief , 414 S.W.3d at 150.
C. Specific Jurisdiction
When determining specific jurisdiction, the focus is on the relationship between the forum, the defendant, and the litigation. Id. ; Retamco Operating , 278 S.W.3d at 338. There must be a substantial connection between the defendant's contacts and the operative facts of the litigation. Moncrief , 414 S.W.3d at 156. The contacts must be such that the defendant "should reasonably anticipate being haled into court" in Texas. World-Wide Volkswagen Corp. v. Woodson , 444 U.S. 286, 311, 100 S.Ct. 580, 587, 62 L.Ed.2d 490 (1980).
In other words, specific jurisdiction is "case-linked" and depends on an "affiliatio[n] between the forum and the underlying controversy[.]" Goodyear v. Dunlop Tires Operations, S.A. v. Brown , 564 U.S. 915, 919, 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011) ; see also Moncrief , 414 S.W.3d at 150 ("[S]pecific jurisdiction exists when the cause of action arises from or is related to purposeful activities in the state."). In determining specific jurisdiction, a court's inquiry is whether there was some act by which the defendant purposefully availed itself of the privilege of conducting activities within the forum State. Goodyear , 564 U.S. at 924, 131 S.Ct. at 2854.
Here, Old Republic argues that Goldsmith purposefully availed herself of the privileges of conducting activities within Texas by engaging in a fraudulent scheme wherein Bell transferred the proceeds of the Property to Goldsmith in order to avoid Bell's creditors. In support of its position, Old Republic delineates this list:
- Goldsmith's conversations with Bell to show Bell's concern about the federal government seizing more of Bell's assets, Goldsmith's knowledge of those concerns, and their plans to address that concern.
- Goldsmith's knowledge that the federal government had taken a restitution lien in conjunction with the criminal suit against Bruce Benson.
- Goldsmith's actions of sending money in small amounts to a Texas resident and a Texas bank account on 81 different occasions beg[inning] shortly after the commencement of the federal criminal action against her husband.
- Bell's disclosure of the following assets: brokerage accounts holding $177,000, an IRA account of $73,000, $229,000 in IRA accounts in Bruce Benson's name, a trust of $43,833.83, a Rolex valued at $3,500, diamond rings worth $19,000, and the purchase of a brand new Nissan without financing.
- Bell's failure to disclose under oath any debt owed to Goldsmith in March 2011, by which time Goldsmith's ledger indicated that Bell owed Goldsmith $89,237.50.
- Goldsmith's recording of liens-in Texas -against two cars owned by Bell (more than a year after she began transferring funds to Bell and the month following the United States' application for writ of garnishment) and another one in 2013.
- Goldsmith's admission that taking the liens "was one way of at least having a little bit of something, you know, out of [Bell's] estate."
- Benson's husband's accusation that Bell's inventory failed to reflect $100,000 in cash that was in her possession at the time of their separation.
- Even though Goldsmith kept track of the funds she transferred to Bell via *11 Quickbooks, Bell's transfer of $56,772.72 more than she purportedly "owed" Goldsmith after she sold the Property to Chandra Chandrasekaran simply because Bell did not know the "bottom-line number" and they would just "work it out later."
- Rather than simply writing Goldsmith a check for the net sales proceeds or wiring the funds to Goldsmith's bank account, Bell's conversion of the proceeds to a cashier's check and delivery to Bell in Louisiana by mail.
- Goldsmith's knowing acceptance of funds from the sale of Texas real property.
The independent acts of Bell and Benson
From this list of eleven, four of the items simply have nothing to do with Goldsmith's alleged contacts with Texas. Indeed, Bell's failure to disclose, or her disclosure of, assets during her divorce from Benson in a Texas court have nothing at all to do with Goldsmith much less Old Republic's contention that Goldsmith and Bell fraudulently transferred the funds from the sale of the Property. And Old Republic has offered nothing more than speculation and innuendo to counter this fact. The only evidence that Old Republic points to regarding these points is copies of amended inventory lists prepared by either Bell or Benson during their divorce. Old Republic offered no evidence to connect Goldsmith to these lists and have offered nothing to connect these lists to this present case. We as a court must imply that the trial court found that Goldsmith had nothing to do with the listing of assets, or failure to list them, in Bell's divorce proceedings. Likewise, the trial court also properly could have found, and we must imply that it did, that Benson's accusations against Bell during their divorce simply did not involve Goldsmith.
Bell's act of placing liens on her vehicles in Goldsmith's name
Included in this list, Old Republic articulates the fact that liens were placed on Bell's vehicles in favor of Goldsmith and that Goldsmith stated that this was done to protect Bell's estate. As Old Republic phrases this point, "[Goldsmith recorded] liens-in Texas -against two cars owned by Bell." There is no evidence that Goldsmith recorded any liens in Texas. In fact, the only evidence of liens placed on Bell's vehicles in Goldsmith's name comes in the form of liens filed by Bell in Texas. Indeed, Goldsmith averred in her deposition that although she was aware of the liens, she did not know where they had been filed or by whom. She also said in her deposition that the liens were placed on the vehicle after Bell learned that she had cancer and that Bell was attempting to protect these assets for Bell's estate. The trial court could have implicitly found that Goldsmith did not file any liens in Texas because that is what the evidence showed. But more than the absence of evidence that Goldsmith took any action regarding these liens to avail herself of the privilege of conducting activities within Texas, there is no evidence demonstrating a substantial connection between Bell having placed liens on her vehicles in Goldsmith's name and Old Republic's claim that Bell and Goldsmith participated in a fraudulent transfer of the funds related to the sale of the Property. See Shell Compañia Argentina de Petroleo, S.A. v. Reef Exploration, Inc. , 84 S.W.3d 830, 837 (Tex. App.-Houston [1st Dist.] 2002, pet. denied) (stating contacts "must have a 'substantial connection' that results in the alleged injuries").
*12 Goldsmith receiving funds and depositing them in Louisiana
Old Republic next points to evidence that Bell converted the funds from the sale of the Property into a cashier's check and delivered that check to Goldsmith in Louisiana by mail. Old Republic seems to imply that this is evidence of tortious conduct on Goldsmith's part. But the only evidence regarding why Bell took this course of action is Goldsmith's deposition testimony that she was unaware of why Bell sent her the money in this manner but that she was aware that Bell was going to be sending her the money. One implication from this evidence is that Goldsmith was not involved in Bell's decision to send her a cashier's check, but a greater implication from this evidence is that it demonstrates no action or contact on Goldsmith's part conducted in or toward Texas. See Michiana Easy Livin' at 791-92, ("[W]e disapprove of those opinions holding that ... specific jurisdiction turns on whether a defendant's contacts were tortious rather than contacts themselves."); see also Moki Mac River Expeditions v. Drugg , 221 S.W.3d 569, 578 (Tex. 2007) ("[A] nonresident may avoid being haled into court in a particular forum by purposefully conducting business so as not to derive benefit or profit from a forum's laws.").
Goldsmith's alleged knowledge of the federal lien
Old Republic also points to what it deems evidence that Bell had conveyed concerns about "the federal government seizing more of Bell's assets" and Goldsmith's knowledge that the "federal government had taken a restitution lien ... against [Benson]." Old Republic further highlights evidence that the proceeds of the sale of the Property exceeded Goldsmith's ledgers of how much she had loaned Bell by more than $50,000.
The first hurdle that Old Republic encounters is that the only evidence regarding what Goldsmith knew about the nature of a potential lien on the Property comes from Goldsmith herself, who averred in her deposition that she was unaware of whether Bell and Benson owned property together; that the fact that the proceeds exceeded the amounts Bell owed Goldsmith was Bell's gratuitous gift toward the Goldsmiths for helping her through a financially taxing time; and that Bell and Goldsmith had never specifically discussed the federal government seizing any of Bell's assets. The trial court could have found from this evidence that there was simply no evidence that Bell and Goldsmith had contrived a scheme to defraud creditors by Bell selling the property and giving the proceeds to Goldsmith for a purpose other than to which Goldsmith averred.
But even if the trial court could have only found that Goldsmith's contacts with Bell were such that Goldsmith participated in a scheme to defraud Bell's creditors in Texas, this is not enough to demonstrate that Goldsmith purposely availed herself of Texas because the evidence affirmatively demonstrates that all of Goldsmith's allegedly fraudulent conduct regarding what she knew of Bell's financial concerns or what funds she received occurred in Louisiana. See Parex Res., Inc. v. ERG Res., LLC , 427 S.W.3d 407, 427 (Tex. App.-Houston [14th Dist.] 2014) ("Parex Canada's telephone, email, and virtual data room contacts with Nabors coupled with a finding that Parex Canada intended the contacts to harm ERG in Texas is not enough to establish purposeful availment."), aff'd by Searcy v. Parex Res., Inc. , 496 S.W.3d 58 (Tex. 2016) ; see also *13 Walden v. Fiore , 571 U.S. 277, 134 S.Ct. 1115, 1125, 188 L.Ed.2d 12 (2014) ("The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.").
Transfers of money to Bell and phone calls between her and Goldsmith
Old Republic also contends that a series of bank transfers from Goldsmith to Bell and phone calls between Goldsmith and Bell, which ostensibly occurred while Bell was in Texas, constituted sufficient contact of Goldsmith with Texas and that these actions are related to Old Republic's claim of a fraudulent transfer scheme. As to the phone calls, there is no evidence of the contents of the phone calls between Goldsmith and Bell, the frequency of calls, or who initiated phone calls and when. Moreover, there is no evidence that Goldsmith, even assuming some of the calls were made from her to Bell, ever sought a benefit, advantage, or profit from these calls. See Moncrief , 414 S.W.3d at 157 ("For contacts to be purposeful, the defendant must seek some 'benefit, advantage, or profit' by availing itself of the forum."). To be sure, the fact that Goldsmith called Bell without more is insufficient to support personal jurisdiction. Alenia Spazio, S.p.A. v. Reid , 130 S.W.3d 201, 204 (Tex. App.-Houston [14th Dist.] 2003, pet. denied), cert. denied , 549 U.S. 821, 127 S.Ct. 136, 166 L.Ed.2d 36 (2006) ("Likewise, numerous telephone and facsimile communications with people in Texas relating to an alleged contract do not establish minimum contacts.").
Although the trial court did not make a specific finding regarding the phone calls, the trial court did repeatedly state that it found the contacts between Goldsmith and Bell to be "domestic" in nature. An implied finding that is supported by the record is that Goldsmith did not seek profit, business, or advantage by calling Bell in Texas, regardless of how often she may have done so. See Bergenholtz v. Cannata , 200 S.W.3d 287, 293-97 (Tex. App.-Dallas 2006, no pet.) (concluding that trial court correctly determined that it lacked personal jurisdiction over California lawyers who represented Texas clients in a California lawsuit and who communicated with the Texas clients about the representation but did not seek out clients in Texas); see also Klenk v. Bustamante , 993 S.W.2d 677, 682 (Tex. App.-San Antonio 1998, no pet.), disapproved on other grounds by BMC Software , 83 S.W.3d at 794.
The fact that Goldsmith sent money to Bell is equally an insufficient basis for concluding that Goldsmith purposefully availed herself of Texas's jurisdiction. See Alenia Spazio , 130 S.W.3d at 213 ("Nevertheless, sending funds to Texas is not determinative."); Shell Compañia Argentina de Petroleo, S.A. , 84 S.W.3d at 839 ("Moreover, payments sent to the forum state are not determinative.").
Deferring as we must to the trial court's implied findings of fact, the record before us contains legally and factually sufficient evidence to support the trial court's implied findings that Goldsmith's contacts with Texas did not constitute purposeful availment. Thus, the trial court did not err by determining that it did not possess specific jurisdiction over Goldsmith.
D. General Jurisdiction
Even though Old Republic did not brief that the trial court had general jurisdiction over Goldsmith, it does sometimes use "continuous and systematic" language. Because this is a jurisdictional question and because we are assuming that Old Republic's third-amended petition is the operable pleading in our inquiry, we will address whether the trial court properly found that *14 Goldsmith was not subject to general jurisdiction.
General jurisdiction may only be exercised over a nonresident defendant whose contacts in the forum state are so continuous and systematic " 'as to render [it] essentially at home in the forum State.' " Daimler AG v. Bauman , 571 U.S. 117, 134 S.Ct. 746, 749, 187 L.Ed.2d 624 (2014) (quoting Goodyear , 564 U.S. at 919, 131 S.Ct. at 2851 ). General jurisdiction requires a more demanding minimum contacts analysis than specific jurisdiction does, and the nonresident defendant must have conducted substantial activities within the forum. BMC Software , 83 S.W.3d at 797. In order for Texas courts to exercise general jurisdiction over a nonresident, the nonresident's contacts with Texas must be continuous, systematic, and substantial. See Goodyear , 564 U.S. at 919, 923-24, 131 S.Ct. at 2851, 2853-54 ; Moki Mac , 221 S.W.3d at 575 ("If the defendant has made continuous and systematic contacts with the forum, general jurisdiction is established whether or not the defendant's alleged liability arises from those contacts."). "General jurisdiction is premised on the notion of consent. That is, by invoking the benefits and protections of a forum's laws, a nonresident defendant consents to being sued there." Am. Type Culture Collection, Inc. , 83 S.W.3d at 808. "General jurisdiction has been described as 'dispute-blind,' an exercise of the court's jurisdiction made without regard to the nature of the claim presented." PHC-Minden , 235 S.W.3d at 168.
As Justice Ginsberg stated in Goodyear , the Court's 1952 decision in Perkins v. Benguet Consolidated Mining Company remains "The textbook case of general jurisdiction appropriately exercised over a foreign corporation that has not consented to suit in the forum." Goodyear , 564 U.S. at 927-28, 131 S.Ct. at 2856 (citing Perkins , 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952) ). The facts in Perkins are illustrative of the type of continuous and systematic contacts by a nonresident defendant which would be sufficient for general jurisdiction. See generally Perkins , 342 U.S. at 447-48, 72 S.Ct. at 419. In Perkins , the president of the company maintained an office in Ohio in which he "did many things on behalf of the company." Id. The president maintained company files in Ohio, drew and distributed salary checks from the Ohio office, sent correspondence from Ohio, used two Ohio bank accounts for company funds, had an Ohio bank act as transfer agent for the company stock, held directors' meetings in Ohio, supervised policies in Ohio dealing with the rehabilitation of the corporation's properties in the Philippines, and dispatched funds from Ohio bank accounts to cover purchases of machinery for the rehabilitation. See ids="640833" index="79" url="https://cite.case.law/us/342/437/">id. By contrast, in Helicopteros , the Supreme Court found that the contacts were insufficient and that there was no continuous and systematic contact with Texas. Helicopteros Nacionales de Colombia, S.A. v. Hall , 466 U.S. 408, 415-19, 104 S.Ct. 1868, 1872-74, 80 L.Ed.2d 404. "Helicol's contacts with Texas consisted of sending its chief executive officer to Houston for a contract-negotiation session; accepting into its New York bank account checks drawn on a Houston bank; purchasing helicopters, equipment, and training services from Bell Helicopter for substantial sums; and sending personnel to Bell's facilities in Fort Worth for training." Id. at 416, 104 S.Ct. at 1873.
The plaintiff must establish more than isolated or sporadic visits with the forum before such contacts will constitute the type of continuous, systematic, and substantial contacts necessary for general jurisdiction. See ids="6200640" index="85" url="https://cite.case.law/us/466/408/#p415">id. at 415-19, 104 S.Ct. at 1872-74. The defendants' contacts with the *15 forum state must be so constant and pervasive as to render them essentially "at home" in Texas. See Daimler AG , 134 S.Ct. at 751 ; Goodyear , 564 U.S. at 919, 131 S.Ct. at 2851.
Here, there is simply no evidence that Goldsmith made the necessary type of continuous and systematic contacts with Texas as to afford a Texas court general jurisdiction over her. Goldsmith averred in her deposition that she had visited Texas a few times but not in the last ten years. And as we addressed above, her calling Bell and sending funds to Bell in Texas are not sufficient contacts even for specific jurisdiction; general jurisdiction requires a more demanding minimum contacts analysis than specific jurisdiction does. There is nothing in this case to indicate that Goldsmith had contacts with Texas that were so constant and pervasive as to render her essentially at home in Texas. We hold that the trial court did not err by granting Goldsmith's special appearance in the face of Old Republic's third-amended petition, which claimed that the trial court had general jurisdiction over her. We overrule Old Republic's sole issue in its entirety.
IV. CONCLUSION
Having overruled Old Republic's sole issue, we affirm the trial court's order granting Goldsmith's special appearance.
GABRIEL, J., filed a dissenting opinion.
DISSENTING MEMORANDUM OPINION
LEE GABRIEL, JUSTICE
The majority opinion concludes that appellee Robin W. Goldsmith's actions of knowing participation in an alleged fraudulent scheme, which included at least eighty-one money transfers to Lisa Bell (a Texas resident) over a four-year period, the recordation of liens on property located in Texas to protect those assets, and the receipt of funds from a fraudulent sale of Texas real property, all in an effort to hinder collection of a federal lien or garnishment, were not sufficient to justify a Texas court's exercise of personal jurisdiction over Goldsmith. Because I believe this holding is not in harmony with well-settled law on specific jurisdiction and minimum contacts, I respectfully dissent.
Goldsmith characterizes the underlying facts of this case in the terms of a fairy tale, complete with "once upon a time," a fairy princess, a frog disguised as a prince, and a rescuing fairy godmother. Goldsmith omits, however, the allegations that the fairy godmother and the fairy princess attempted to hide the kingdom's riches from others who were not characters in their tale.
Goldsmith and Bell were admittedly close and had been friends since "the late '70s." Bell married Bruce Benson in 2002, and they bought a home together in Arlington, Texas. The marriage fell apart after Benson was criminally charged in 2009 for aiding and abetting the making of a false, fictitious, or fraudulent claim to the federal government. See 18 U.S.C.A. §§ 2, 287 (West 2015). Along with his 24-month sentence, the federal court ordered Benson to pay $782,297.14 in restitution. To satisfy the judgment, the government filed a restitution lien and sought to garnish Benson's nonexempt property, which would include his community property with Bell. Goldsmith admitted she knew about the lien.
When Benson's legal troubles began, Bell became "worried" and started "trying to plan, brainstorming" with Goldsmith about "what do [Goldsmith and Bell] do next." In 2009 shortly before Benson was federally sentenced, Goldsmith, who resides in Louisiana, began to transfer sums *16 of money to Bell in Texas. On September 10, 2011, liens on Bell's two cars were recorded in favor of Goldsmith. Bell and Benson divorced in 2011, and Goldsmith designated one $10,000 transfer to Bell in 2010 as being for Bell's "legal" expenses. After the divorce, Goldsmith continued to regularly transfer money to Bell. Between 2009 and 2012, Goldsmith transferred almost $150,000 to Bell in Texas.
On August 22, 2012, Bell sold the Arlington home to Chitra Chandrasekaran for $215,000. The government's lien was not noted in the warranty deed, and Bell did not disclose that the house had been bought during her prior marriage. Appellant Old Republic Title Insurance Company issued the title policy for the sale. Bell cashed the check she received in the amount of $202,574.88-the net proceeds amount from the sale-and immediately had the funds converted into a cashier's check made out to Goldsmith. Goldsmith received the check in Louisiana and deposited the funds in her Louisiana bank. The check amount was $56,772.72 more than Goldsmith had transferred to Bell over the previous four years. Goldsmith began disbursing the surplus amount and more back to Bell in Texas in the form of several additional money transfers. A year later, the government contacted Chandrasekaran and informed her of the lien that had attached to the home she purchased from Bell. Old Republic, as the title insurer, remitted the amount of the sale proceeds to the government.
Old Republic, a Minnesota corporation registered to do business in Texas, filed suit against Bell and Goldsmith. Old Republic's claim against Goldsmith arose under the Uniform Fraudulent Transfer Act, which creates tort liability not only against "the person for whose benefit the transfer was made" but also against "the first transferee of the asset" or any "subsequent transferee." Tex. Bus. & Com. Code Ann. § 24.009(b) (West 2015); see itation index="91" url="https://cite.case.law/citations/?q=Tex.%20Code%20Ann.%20%C2%A7%2024.009">id. § 24.005 (West 2015) (creating liability for and defining fraudulent transfers as to present or future creditors). Old Republic alleged that Goldsmith participated in a four-year, fraudulent scheme involving the multiple transfers of money between Goldsmith in Louisiana and Bell in Texas in an attempt "to avoid satisfaction of the Federal Lien" and "to prevent [Old Republic] from obtaining collection of [its subrogated] claim for reimbursement for payment of the Federal Lien." Goldsmith allegedly knew that at the time of these money transfers, the federal government "had filed criminal charges against Bell's husband," which led to the federal lien on Bell's community property in the amount of $782,297.14 in 2009. Old Republic alleged that Goldsmith knew of the lien, "brainstorm[ed]" with Bell about "what [to] do next" regarding Bell's "worr[y] about the federal government trying to collect" on the lien, and knew Bell's repayments to her after the sale of the real estate were more than she was owed for the prior money transfers and were attempts to "hinder and defraud" those seeking satisfaction of the lien. Significantly, Old Republic alleged that when Goldsmith received the sale proceeds from Bell, Goldsmith knew that Bell "was in serious financial difficulty ... in that all or a substantial portion of her other assets had previously been garnished by the United States." Bell's transfer of the proceeds from the sale to Chandrasekaran allegedly "was made to Goldsmith for nothing of reasonably equivalent value," and Goldsmith allegedly resumed sending money to Bell after receiving the sale proceeds. Additionally, the jurisdictional evidence submitted to the trial court showed that Goldsmith was aware that there were liens on Bell's cars in favor of Goldsmith, which Goldsmith stated were filed to "take care *17 of [Bell's] children" and were "legitimate asset[s] that [Goldsmith] could hold" for their benefit.
As the majority opinion recognizes, our personal-jurisdiction inquiry must be divorced from the underlying merits of Old Republic's claims brought against Goldsmith, and we may ask only whether Old Republic's allegations were sufficient to justify subjecting Goldsmith to jurisdiction in a Texas court. And although we are not to consider solely whether Goldsmith's actions were tortious or where the effect of those actions was felt, we can consider whether Goldsmith's contacts with Texas were substantially connected to the operative facts of the litigation. See Searcy v. Parex Res., Inc. , 496 S.W.3d 58, 67-70 (Tex. 2016) ; Cornerstone Healthcare Grp. Holding, Inc. v. Nautic Mgmt. VI, L.P. , 493 S.W.3d 65, 73-74 (Tex. 2016), petition for cert. filed , (U.S. Oct. 18, 2016) (No. 16-522); Glencoe Capital Partners II, L.P. v. Gernsbacher , 269 S.W.3d 157, 166-67 (Tex. App.-Fort Worth 2008, no pet).
The majority opinion concludes that Goldsmith's alleged contacts with Texas are not sufficient to support specific jurisdiction and focuses on the facts that Bell unilaterally recorded the liens on her cars, sold the real property without disclosing the government's lien, and transferred the sale proceeds to Goldsmith and that Goldsmith only talked to Bell on the phone and sent Bell funds in Texas. But Old Republic alleges that Goldsmith received liens on Texas property and funds from a Texas resident, after Goldsmith knew the federal lien existed, for the purposes of defrauding Old Republic, a company registered to do business in Texas. Whether Goldsmith actually performed actions in Texas is not dispositive; we are to look at the substantial connection Goldsmith's actions have with the fraudulent scheme that occurred in Texas. See Camac v. Dontos , 390 S.W.3d 398, 409 (Tex. App.-Dallas 2012, no pet.) ; Glencoe , 269 S.W.3d at 163 ; Touradji v. Beach Capital P'ship, L.P. , 316 S.W.3d 15, 30-31 (Tex. App.-Houston [1st Dist.] 2010, no pet.).
Old Republic's allegations show that Goldsmith was a "willing participant" in Bell's apparent scheme to by-pass the effects of the federal lien. Retamco Operating, Inc. v. Republic Drilling Co. , 278 S.W.3d 333, 340 (Tex. 2009). "In Texas, personal jurisdiction may be found where a defendant takes part in any aspect of a tortious scheme that impacts Texas citizens, regardless of a defendant's other links to [Texas]." See San Pedro Impulsora de Inmuebles Especiales, S.A. de C.V. v. Villarreal , 330 S.W.3d 27, 40-41 (Tex. App.-Corpus Christi 2010, no pet.). I would conclude that the contacts alleged by Old Republic and supported by competent evidence, viewed as a whole and not in isolation, arose from or were related to an activity conducted within Texas such that the exercise of specific jurisdiction over Goldsmith would not offend due process. See Retamco , 278 S.W.3d at 340-42 ; Trigeant Holdings, Ltd. v. Jones , 183 S.W.3d 717, 727-28 (Tex. App.-Houston [1st Dist.] 2005, pet. denied) (op. on reh'g); accord Dontos v. Vendomation NZ Ltd. , 582 Fed.Appx. 338, 347-48 (5th Cir. 2014) ; Mullins v. TestAmerica, Inc. , 564 F.3d 386, 400-02 (5th Cir. 2009) ; Sourcing Mgmt., Inc. v. Simclar, Inc. , 118 F.Supp.3d 899, 910-12 (N.D. Tex. 2015) ; cf. Dawson-Austin v. Austin , 968 S.W.2d 319, 327 (Tex. 1998) (holding Texas court lacked personal jurisdiction to divide marital estate where husband moved to Texas, unilaterally transported assets into Texas, and bought Texas property after separation and wife was nonresident), cert. denied , 525 U.S. 1067, 119 S.Ct. 795, 142 L.Ed.2d 657 (1999). I agree with Old Republic that to conclude otherwise would allow nonresidents to "rest easy, knowing *18 they may conspire with Texas residents to fraudulently transfer Texas-based assets without fear of answering for that fraud in Texas courts."
Because the trial court had personal, specific jurisdiction over Goldsmith based on these alleged contacts, it erred by granting Goldsmith's special appearance. Accordingly, I would reverse the trial court's order. Because the majority opinion does not, I dissent.